UNITED STATES of America,
Plaintiff,

v.

John C. HUNTER, Defendant.

Nos. 2:97–CR–382J, 2:98–CR–198K.

United States District Court,
D. Utah,
Central Division.

Nov. 4, 1998.

Wayne Dance, Asst. U.S. Atty., Salt Lake City, for plaintiff.

Richard Mauro, Salt Lake City, for defendant.

## MEMORANDUM OPINION

JENKINS, Senior District Judge.

On October 16, 1998, the defendant John C. Hunter appeared before the Court for sentencing. Hunter, who was present, was represented by Richard Mauro; Assistant United States Attorney Wayne Dance appeared on behalf of the United States. After listening to the proffered testimony and examining the exhibits received, and after listening to the arguments of counsel, the Court determined, among other things, that the defendant was not an organizer or leader of the criminal activity and that the amount of loss for sentencing purposes was in excess of $10,000 but less than $20,000. The Court then sentenced the defendant to a ten-month term of imprisonment. For reasons stated on the record, and as supplemented below, the Court reaffirms those findings.

### Brief Background

On November 19, 1997, the defendant John Hunter and two co-defendants, Kelby Chadburn and Linden Stucki, were charged in a five-count indictment with violating the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. § 470ee, and with damaging United States property in violation of 18 U.S.C. § 1361.[1] Count I charged that in or about late

---

1. Hunter and his co-defendants were also charged under 18 U.S.C. § 2 with aiding and abetting in these violations.

spring or early summer of 1995, Hunter knowingly excavated and damaged archaeological resources relating to the Fremont culture that were located in the Dixie National Forest at the Santa Clara River Gorge Shelter site. Count IV similarly charged that in or about the summer of 1995, Hunter willfully injured and committed depredation against the property of the United States in the Dixie National Forest by digging, excavating, and otherwise altering and defacing the Santa Clara River Gorge Shelter site. On June 10, 1998, Hunter entered a plea of guilty to these two counts.

On April 15, 1998, Hunter and John Robinson were charged in a separate two-count indictment with similar violations for excavating and damaging property of the United States at the Big Round Valley site in the Dixie Resource Management Area, an area managed by the Bureau of Land Management. This indictment was assigned case no. 2:98–CR–198K, and was assigned to Judge Kimball. Count I of this second indictment charged that Hunter, on or about April 24, 1993, violated ARPA by knowingly excavating, damaging, and removing prehistoric archaeological resources from the Big Round Valley site. On June 10, 1998, before Judge Kimball, Hunter entered a plea of guilty to Count I. By Order dated September 3, 1998, the two cases were consolidated for sentencing purposes.

**Discussion**

Among the issues to be resolved at the sentencing hearing were: (1) was Hunter a "leader" or "organizer" of a criminal activity within the meaning of section 3B1.1 of the Sentencing Guidelines? (2) was the Presentence Report's ("PSR") calculation of Hunter's criminal history score and resulting criminal history category correct? and (3) what was the amount of "loss" for sentencing purposes under the Sentencing Guidelines?

*1. Was Hunter an Organizer or Leader for Sentencing Purposes?*

Paragraph 64 of the PSR recommends that, pursuant to U.S.S.G. § 3B1.1(c) (1997), Hunter's base offense level should be adjusted by increasing his offense level by two levels to reflect his role as an "organizer/leader" of the unlawful excavations. Hunter specifically objected to this adjustment.

■ In determining whether a defendant was an organizer or a leader, the sentencing court should consider whether the defendant exercised decision making authority, the extent of the defendant's participation in the offense, his role in recruiting accomplices, his role in planning or organizing the offense, and the degree of control or authority the defendant exercised over other co-conspirators. *See* § 3B1.1, comment. (n. 4); *United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir.), *cert. denied*, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 845 and 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). "[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals, because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." *Torres*, 53 F.3d at 1142 (citations and internal quotation marks omitted).

In support of this adjustment, the United States offered the testimony of David Griffel, special agent for the United States Forest Service, and Rudy Mauldin, special agent for the Bureau of Land Management. The sum of the agents' testimony was that others charged with Mr. Hunter, and an individual named Burt Rondo, asserted that Hunter was the moving force behind the excavations. This testimony, however, is far from persuasive on the issue of Hunter's alleged leadership role.

As an initial matter, these statements have been contradicted. Specifically, when John Robinson, Hunter's co-defendant, was asked about the excavation at Big

Round Valley, he stated that it was a "spur of the moment" thing. (*See* PSR ¶ 49.) Moreover, Mr. Rondo, who has himself been charged with archaeological violations at the ·Big Round Valley site, was found in possession of the excavating equipment that had been used at the Santa Clara River Gorge Shelter site and, indeed, stated that he (Rondo) was the person who originally brought Hunter to the site. Such testimony makes one wonder whether it might have been Mr. Rondo, rather than Hunter, who was the organizer or leader of the excavations.

 Assessing the value and reliability, if any, of the proffered evidence is made even more difficult by the form in which it was presented. Instead of offering the live testimony of the speakers— Hunter's co-defendants and Rondo—the United States offered the statements of the listeners—the federal agents. Without an opportunity to examine the demeanor of the actual speaker (or for defendant Hunter to cross-examine the speaker), the Court is not in a position to attach any heightened credibility to these statements.[2]

 Rather than demonstrating that Hunter was a leader or organizer, the proffered evidence merely demonstrates that Hunter may have been an important or essential figure. Although he admittedly knew how to find the archaeological sites, there was no direct evidence that the excavations were organized in any fashion by Hunter. Indeed as one co-defendant

purportedly described an excavation, it was a "spur of the moment" thing. Nor was there any direct evidence that Hunter had a greater participatory role in the offenses. Each of the participants took turns excavating and each came away with the same type of bounty. Hunter's role was neither greater nor lesser than any other willing participant.

At best, the evidence of Hunter's (or any other person's) leadership role in these offenses remains in doubt. The United States has failed to demonstrate, by a preponderance of the evidence, that Hunter was an organizer or leader of the excavations. Therefore, a two-level increase in Hunter's base offense level under section 3B1.1(c) is not warranted.

### 2. Did the PSR Accurately Calculate Hunter's Criminal History?

Hunter argues that the PSR overstates his criminal history score by one point. In particular, he argues that he should not have been assessed any criminal history points for a 1986 California criminal trespass conviction.

Generally, under the Sentencing Guidelines, no criminal history points will be added for trespass offenses. *See* U.S.S.G. § 4A1.2(c)(1). If the prior trespass offense is similar to the present offense, however, criminal history points will be added. *See* U.S.S.G. § 4A1.2(c).

 Hunter does not dispute the factual findings in the PSR that the California

---

2. Of course, the Court recognizes that it may consider hearsay statements at sentencing. *See United States v. Fennell*, 65 F.3d 812, 813 (10th Cir.1995). To be considered, however, the sentencing court must first find that the hearsay statements possess some minimum indicia of reliability. *See id.; see also United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997) (noting that any information may be considered at sentencing as long as the information bears some sufficient indicia of reliability); U.S.S.G. § 6A1.3(a), p.s., (stating that the court "may consider relevant information without regard to its admissibility under the rules of evidence

..., provided that the information has sufficient indicia of reliability to support its probable accuracy."). What weight, if any, that may attach to these statements, however, is left entirely to the sentencing court's sound discretion. *See Hili v. Sciarrotta*, 140 F.3d 210, 215 (2d Cir.1998) ("[H]earsay information may unquestionably be used in the discretion of the sentencing judge and given such weight as appears in his discretion to be merited.") (quoting *United States v. Napolitano*, 761 F.2d 135, 139 (2d Cir.), *cert. denied*, 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985)).

trespass occurred at a site where several Chumash Indian archaeological sites had been illegally excavated. Thus, it is uncontroverted that the California trespass is "similar" to the present offense—that is, both offenses involved unlawful activity at known archaeological sites. In light of this similarity, the Court finds that the PSR was correct in adding one criminal history point for the trespass to Hunter's criminal history score. *See* U.S.S.G. § 4A1.1(c).[3]

### 3. What is the Measure of "Loss" for Sentencing Purposes?

In cases concerning the damage or destruction of property, Congress, through its surrogate the United States Sentencing Commission, has determined that the measure of the sentence should be based primarily on the "loss" of the property damaged or destroyed. *See* U.S.S.G. § 2B1.3(b)(1) and § 2B1.1, comment. (n. 2). When property is taken or destroyed, the "loss" is ordinarily measured by the "fair market value" of the property. U.S.S.G. § 2B1.1, comment (n. 2). When property is damaged, the "loss" is "the cost of repairs, not to exceed the loss had the property been destroyed [*i.e.*, the fair market value]." *Id.*

### A. Cost of Restoration and Repair

In this case, the United States concedes that the amount of restitution Hunter is obligated to repay is $9,661.47. This amount, says the United States, reflects the estimated cost of restoration and repair at the damaged archaeological sites. (The actual out-of-pocket cost to date, however, is far less.) The archaeological artifacts that Hunter allegedly removed from the sites—anywhere between five and fifteen arrowheads, and one partial spear point—were not assigned any market value by the United States. Thus, the

ordinary measure of "loss" caused by Hunter's criminal activities totals $9,661.47. *See id.*

Insofar as "loss" is concerned, the Court further finds that Hunter caused a loss— an aesthetic diminishment at the sites— that is not fully taken into account by the cost of restoration and repair.

### B. Aesthetic Diminishment as a "Loss"

Although the United States can backfill the holes dug by Hunter and grade the sites to reflect their pre-excavation topography, because the sites are no longer in pristine condition, they have been diminished. The diminishment may be subtle, but it is ever-present.

By analogy, what if one of the petroglyphs near the Santa Clara River Gorge Shelter was damaged by a vandal painting over it. Although the archaeological resource itself has not been lost—it would remain under a layer of paint—the resource has been damaged. Certainly the measured "loss" should include the cost of removing the paint and restoring the petroglyph. There is no loss for "archaeological value," however, because the petroglyph remains, as it did before it was vandalized, on the rock face with all its archaeological context intact. Nevertheless, even after cleaning and restoring the petroglyph, the image remains forever tarnished. It is no longer in pristine condition. A small fragment of paint may remain or the hue of the surrounding rock or the image itself may have changed. Importantly, to those who ascribe a spiritual value to these images, that value may be gone forever, wiped away by the vandal's act or by the paint cleaner. Thus, even if restored to its "original" condition, the petroglyph has suffered a diminishment. In such a case, a loss based solely upon the cost of restoration and repair, while ade-

---

**3.** At the October 16, 1998 sentencing hearing, Hunter's attorney did not offer any argument on the trespass question. Rather, he impliedly acknowledged the abstract nature of the

Court's inquiry by noting that Hunter's criminal history category would remain unchanged at a level III regardless of the Court's determination on the trespass conviction.

quate, may not fully capture the harm caused. A "loss" that included a value for the diminishment, as well as the costs to restore, would be more reasonable and appropriate.

■ For this reason, the Court concludes that an additional $2,000 should be added to the cost of restoration and repair to reflect this diminishment at the sites. Even when "fully restored," they can never be put back to their pre-excavation condition. Thus, the additional $2,000, which was not objected to by the United States or Hunter, represents the Court's estimate of this admittedly subjective aesthetic diminishment. Thus, the total "loss" for sentencing purposes is $11,-661.47. Such is a reasonable measure to calculate the actual loss incurred.

### C. Shumway and "Archaeological Value"

Nevertheless, the United States argues that Hunter's sentence should be based on a greater amount of "loss." To this end, the United States, relying on *United States v. Shumway*, 112 F.3d 1413 (10th Cir.1997), asserts that "loss" in this case should include not only the estimated cost of restoration and repair, but also the "archaeological value" associated with archaeological sites.

■ For several reasons, each of which will be discussed in more detail below, the Court finds that the calculation of "loss" in this case should not include any additional amount reflecting "archaeological value." First, although the court of appeals in *Shumway* did approve this measure of "loss," it approved this measure as one the court may turn to in calculating loss for sentencing purposes if it finds that the ordinary measures of "loss" are inadequate to account for damage actually incurred. Because the measures of loss relied upon

by the Court in this case are sufficient, an additional adjustment for "archaeological value" seems superfluous and need not be included. Moreover, Shumway was concerned with egregious conduct not present in Hunter's case, and the archaeological values at issue here and in *Shumway* are vastly different.

Furthermore, because the Court finds that the estimates of "archaeological value" offered by the United States are unreliable, they cannot be used to sentence Hunter even if the Court were to factor "archaeological value" into the loss calculation. Notably, each time the United States came before this Court on matters concerning the same Santa Clara River Gorge Shelter site, the United States has proffered different calculations of archaeological value. The disparity between these proffered calculations highlights the unreliability of this information.

As defined in the regulations promulgated by the Secretary of the Interior, "archaeological value" is the "value of the information associated with the archaeological resource." 43 C.F.R. § 7.14(a) (1997). This intangible value "shall be appraised in terms of the costs of the retrieval of the scientific information which would have been obtainable prior to the violation." *Id.* The costs of retrieval may include the cost of preparing a research design, conducting field work and laboratory analyses, and preparing reports. *Id.* (emphasis added.) Simply put, "archaeological value" is an effort to go back in time before the violation occurred and estimate what it would have cost the United States to engage in a full-blown archaeological dig at the site, notwithstanding the fact that the United States had no plans to engage in any such effort. In the present case, the "archaeological value," as proffered by the United States, totals $34,-238.18. This figure, if added to the cost of restoration and repair, would bring the alleged "loss" up to $43,895.65.[4]

---

4. The breakdown of the "loss," as proffered by the United States is as follows:

Cost of Restoration and Repair:
| | |
|---|---|
| Santa Clara River Gorge Shelter: | $ 8,430.29 |
| Big Round Valley: | 1,231.18 |

As the United States suggests, *Shumway,* does indeed approve of this type of loss calculation as one way of calculating loss for sentencing purposes. Yet it is not the only way.

In *Shumway,* the defendant was sentenced in a consolidated sentencing proceeding on three separate ARPA violations and three separate but related counts of damaging United States' property. The sentencing court was called upon to impose a sentence on the defendant pursuant to section 2B1.3 of the Sentencing Guidelines. This required the court to sentence the defendant based upon the "loss" associated with defendant's convictions. *See* U.S.S.G. §§ 2B1.3(b) and 2B1.1, comment (n. 2). Although the sum of the fair market value of the artifacts taken and the cost of restoration and repair totaled $9,122, the sentencing court added an amount for "archaeological value" to arrive at a "loss" of more than $120,000. This measure of "loss" resulted in a five-level increase in the defendant's offense level. *See* U.S.S.G. §§ 2B1.1(b)(1)(E) (increasing offense level by four if the loss is greater than $5,000 but less than $10,000) and 2B1.1(b)(1)(J) (increasing offense level by nine if loss is greater than $120,000 but less than $200,-000).

In order to justify its measure of "loss," the sentencing court relied on a provision in the Sentencing Guidelines that provided that "[w]here the market value is difficult to ascertain or inadequate to measure the harm to the victim, the court *may* measure loss in some other way." U.S.S.G. § 2B1.1, comment (n. 2.) (emphasis added). By calculating the "loss" based not only on the actual "loss"—that is, the fair market value of the property taken or destroyed and the cost of repair—but also by including a sum for "archaeological value," the

sentencing court implicitly found that the fair market value of the artifacts taken and the cost of restoration and repair were inadequate to reflect the harm caused by the defendant.

In *Shumway,* the defendant, who had a previous ARPA conviction, was a grave robber who desecrated a Native American burial ground. During one of the violations, a person digging with the defendant discovered the skeletal remains of an infant wrapped in a burial blanket. The defendant, recognizing the site as a burial site, took over the digging. After fully excavating the infant's remains, the defendant removed the burial blanket and left the infant's remains on the ground. When the site was later inspected, all but the infant's skull was gone. *See Shumway,* 112 F.3d at 1417–18. At a second site, the defendant found and removed sandals and a sleeping mat.

In affirming the sentencing court's calculation, the court of appeals agreed that the "paltry sum of $9,122, the asserted cost of the artifact's fair market value and cost of restoration and repair, fails to reflect adequately the extent of the damage [the defendant] inflicted." *Shumway,* 112 F.3d at 1425. Specifically, the court of appeals concluded that the fair market value and the cost of restoration were "grossly insufficient to quantify the devastating and irremediable cultural, scientific and spiritual damage [the defendant] caused to the American people in general and the Native American community in particular." *Id.* The court of appeals concluded that in such an instance, where it has been determined that the ordinary measure of "loss" is inadequate to measure the extent of the harm caused, it was proper for the sentencing court, based upon the "flexible pro-

| | | $ 9,661.47 |
|---|---|---|
| Archaeological Value: | | |
| Santa Clzra River Gorge Shelter: | $27,502.18 | |
| Big Round Valley: | 6,736.00 | |
| | | $34.238.18 |
| Total "Loss": | | $43,895.65 |

vision" found in application note 2 of § 2B1.1, to use some other reasonable measure to calculate loss. *Id.* at 1425–26.

In this case, the United States failed to offer any evidence whatsoever as to the fair market value of the arrowheads taken from the two sites.[5] Absent such evidence, the Court is not in a position to assess whether the unknown fair market value of the arrowheads, when added to the cost of restoration and repair, would or would not adequately reflect the harm caused by Hunter.

Moreover, in *Shumway*, there was great disparity between the ordinary calculation of loss ($9,122) and the "loss" calculated by using "archaeological value" (approximately $137,200). Indeed, the latter measurement was fifteen times greater. With such a large difference between these "losses," it would be reasonable to infer, as the sentencing court in *Shumway* apparently did, that the lower loss calculation may have been inadequate to reflect the actual harm caused. In the present case, however, the "loss" as calculated using the Government's last proffered "archaeological value" estimate ($43,895), is only four and one-half times greater than the ordinary loss calculation ($9,661).

Indeed, as a factual matter, this case is very different from *Shumway*.

In *Shumway*, the court of appeals noted the "special import" of the defendant's conduct and appropriately characterized his actions as "undoubtedly detestable ... [and] worthy of severe castigation." 112 F.3d at 1423 n. 4. By contrast, there was

no evidence that Hunter's unlawful excavations disturbed any type of sacred ground or burial site. Unlike the defendant in *Shumway*, Hunter did not disturb any human remains or find and remove any items of great archaeological importance.[6]

In *Shumway*, the court of appeals recognized that, under the Sentencing Guidelines, a sentencing court in its discretion may use a measure other than ordinary measures to calculate loss. This approach was not mandated by the court in every case. Rather, the court simply noted that in proper circumstances—that is, where the sentencing court has made a finding that the ordinary measures of loss are inadequate to reflect the damage caused by the defendant—the sentencing court *may* rely on some other reasonable measure of loss for sentencing purposes, such as "archaeological value."

For the reasons discussed above, the Court finds that the cost of restoring the two archaeological sites, coupled with an adjustment for the loss of the pristine nature of the site (on aesthetic values more than anything else) adequately reflects the extent of the damage actually caused by Hunter. Thus, there is no need for the Court to rely on the contradictory archaeological value calculations offered by the United States.

### D. Reliability of the "Archaeological Value" Calculations

Even if the Court believed that an adjustment for "archaeological value" was warranted, the Court finds that the "archaeological value" estimate offered by the

---

5. It appears that arrowheads are treated differently than other artifacts. For example, the removal of arrowheads from the surface of the ground is exempt from ARPA's civil and criminal sanctions. *See* 16 U.S.C. §§ 470ee(g) (exempt from criminal) & 470ff(a)(3) (exempt from civil); *see also* 36 C.F.R. § 296.16(a)(3); 43 C.F.R. § 7.16(a)(3). Thus, at least when the archaeological resource violation concerns arrowheads, apparently it is the excavation, rather than the removal of the arrowheads, that is the harmful conduct. In the case of other artifacts,

such as a burial blanket, the mere removal of the artifacts, whether on the surface of the ground or not, is punishable under ARPA. *See* 16 U.S.C. § 470ee(a) ("No person may ... remove ... or attempt to ... remove ... any archaeological resource....").

6. All Hunter found and removed were some arrowheads. As noted previously (*see* footnote 5, *supra*), Congress has apparently determined that arrowheads are of lesser archaeological importance that other artifacts.

United States lacks sufficient reliability to be used for sentencing purposes. To begin with, the United States has offered *two* archaeological damage assessment reports, each offering substantially different valuations. The first report, prepared in November 1995 by the archaeologist who personally inspected the Santa Clara River Gorge Shelter site, estimated the archaeological value at $15,645. (Def.Ex. A, at 6.) This report also calculated the cost of restoration and repair at $16,595.56. (*Id.* at Appendix A.) The second report, prepared on September 23, 1998 (and not served on the defendant until the morning of the sentencing hearing) by an archaeologist who did not visit the site, estimated the archaeological value at $27,502.18. (Gov't Ex. 3, at 13.)

In examining these two reports, the Court has had a difficult time reconciling the asserted values. For example, even when comparing known actual costs, such as the hourly rate for the archaeologist who prepared the first report, the rates are different. (Def.Ex. A, at 7 (archaeologist rate of $19.32 per hour); Gov't Ex. 3, at 15 ¶ A (archaeologist rate of $27.45 per hour)). In addition, the mileage charges in the two reports differ. (Def.Ex. A., at 7 (mileage rate $0.37); Gov't Ex. 3, at 15, ¶ A (mileage rates $0.235 and $0.15).) Moreover, although the first report includes a clerical charge, there is no corresponding charge in the second report. (Def.Ex. A, at 7.) Given these differences, the Court is rightly concerned with the reliability of any estimates in damage assessment reports that cannot even agree on known actual costs. This concern is not lessened by the fact that the United States did not deliver the second report to Hunter until the day of his sentencing—a delay that precluded Hunter from effectively challenging the accuracy of the second report.

Moreover, at the October 16, 1998 sentencing hearing, for the first time the United States advised the Court that the first report contained inaccurate calculations for both the archaeological value and the cost of restoration and repair. This acknowledged inaccuracy troubles the Court.

The reliability of the archaeological damage assessment reports becomes even more suspect when the indictment is examined closely. As mentioned above, Hunter and two co-defendants, Kelby Chadburn and Linden Stucki, were charged in a four-count indictment with ARPA and related violations. Specifically, Count I charged Hunter and Chadburn with knowingly excavating and damaging archaeological resources at the Santa Clara River Gorge Shelter "[i]n or about late spring or early summer of 1995, but not later than July 25, 1995." Count III charged Hunter, Chadburn, and Stucki with knowingly excavating and damaging archaeological resources at the Santa Clara River Gorge Shelter "[i]n or about the summer of 1995, but no later than July 25, 1995." Count IV similarly charged Hunter, Chadburn, and Stucki with willfully injuring property of the United States by digging and excavating the Santa Clara River Gorge Shelter "[i]n or about the summer of 1995, but no later than July 25, 1995." On February 20, 1998, Chadburn entered a guilty plea to Count Three. On June 10, 1998, Hunter entered a plea of guilty to Counts One and Four, and, on August 11, 1998, Stucki entered a guilty plea to Count Three.

On July 17, 1998, Kelby Chadburn appeared for sentencing. At sentencing, the United States, relying on the now-discredited first report, sought a sentence for Chadburn based upon a cost of restoration and repair of $17,495 [7] and an archaeological value of $15,645. At that time, the United States asserted that these amounts

---

7. This amount is apparently the sum of the estimated costs of restoration ($16,595.56) and the actual costs incurred by the Forest Service at the Santa Clara River Gorge Shelter site ($899.94).

were accurate. The Court relied on these valuations in sentencing Chadburn to an eight-month term of imprisonment and in ordering restitution.[8] Of course, the United States now says that these calculations were inaccurate.

Tellingly, although defendants Chadburn and Stucki pled guilty to the very same offense, the calculations proffered by the United States in their respective cases for cost of restoration and repair and archaeological value are drastically different. As noted previously, in Chadburn's case the cost of restoration and repair was $17,495 and archaeological value was $15,645. For Stucki, however, the calculations, as contained in the presentence report (and to which the United States did not object), were $6,876 and $2,107, respectively. (Stucki PSR ¶ 11.) Although the United States has now acknowledged that the cal-

culations used at Chadburn's sentencing are inaccurate, the suggested revisions— $8,430.29 and $27,502.18, respectively—are much greater than those assigned in Stucki's case. The United States has not offered any explanation for the difference.[9] Thus, as to Count III, the United States has offered two widely divergent valuations for the same archaeological damage. This difference highlights what the Court considers the less-than-reliable nature of some of these valuations.[10]

Thus, even if the Court were to rely on the archaeological value calculation offered by the United States, the Court finds that the calculations supplied by the United States are unreliable and overstate the archaeological value associated with Hunter's unlawful activities. Admittedly, all Hunter uncovered during his excavations

8. Despite the fact that the United States has had knowledge of the inaccuracy of these measures since September 23, 1998, the United States has not yet advised Chadburn's attorney of the error

9. To the extent that the United States may claim that the increased values for Chadburn reflect damages from the unlawful excavations alleged in Count I, that argument is belied by the express language of the indictment. In Count Three, the indictment states that "this offense [Count III] [is] a separate and distinct offense and occurrence from that alleged in Count I." The United States did not suggest at sentencing that the unlawful conduct alleged in Count I should be considered "relevant conduct" for sentencing purposes under U.S.S.G. § 1B1.3. Indeed, there is no mention anywhere in Chadburn's PSR that the conduct alleged in Count I would be used to calculate his sentence. Thus, if the calculations the United States now offers for archaeological value and cost of restoration are to be considered reliable, the calculations should have been the same for both defendants, because both Stucki and Chadburn were both convicted under Count III,

10. In the "Statement By Defendant in Advance of Plea of Guilty," drafted by the Assistant United States Attorney, and signed by him, Stucki, and Stucki's attorney, the United States stipulated that as to Count III, the archaeological value was $5,215 and the cost of restoration and repair $5,832. (See State-

ment ¶ 10.C(1), (2)). Under the Sentencing Guidelines, factual stipulations must "set forth the relevant facts and circumstances of the actual offense conduct" and may "not contain any misleading facts." U.S.S.G. § 6B1.4(a)(1), (2), p.s. As noted in the commentary, "it is not appropriate for the parties to stipulate to misleading or non-existent facts, even when both parties are willing.... Rather, the parties should fully disclose the actual facts and then explain to the court the reasons why the disposition of the case should differ from that which such facts ordinarily would require under the guidelines." U.S.S.G. § 6B1.4, p.s, comment. Indeed, the responsibility to be accurate in a factual stipulation in a plea agreement is great: under the guidelines, regardless of the offense of conviction, if the stipulation establishes a more serious offense, the sentencing court is directed to determine the sentence based on the stipulated and more serious offense. See U.S.S.G. § 1B1.2(a); see also Richard Thornburgh, Attorney General, Memorandum to Federal Prosecutors [Thornburgh Bluesheet], "Plea Policy for Federal Prosecutors," March 13, 1989, reprinted in 6 Fed.Sent.R. 347 (1994) ("If a prosecutor wishes to support a departure from the guidelines, he or she should candidly do so and not stipulate to facts that are untrue. Stipulations to untrue facts are unethical."). While the Court did not hold the parties to the stipulated amounts, the United States' willingness to agree to yet another calculation of loss is more evidence of the fluid and less-than-reliable nature of these estimates.

were some arrowheads. No other archaeological resource or artifact was removed. The question then becomes, "What has the United States lost?" The United States has not lost the arrowheads: they were surrendered to the United States. (Indeed, it could be said the United States has enjoyed a gain of sorts. As part of his plea agreement, Hunter agreed to surrender not only the ill-gotten arrowheads, but also the totality of his personal archaeological collection—a collection that contains artifacts that were legally acquired.) In the Court's view, what has been lost is the context in which the arrowheads were found. In other words, what the United States has lost is the information concerning the location of the arrowheads to one another, their exact location at the sites when uncovered, and whether they where recovered with or nearby any other items of archaeological import.

Unfortunately, the United States' estimates regarding archaeological value do not put a dollar value on this context. Instead, the offered archaeological value presents a fiction. Starting with the assumption that the site was never excavated, it goes on to estimate what it would have cost the United States to prepare a study of the site, to excavate the site, to remove, analyze, and store any artifacts, and to prepare scientific reports. *See* 43 C.F.R. § 7.14(a). The problem with this fiction is that it does not reflect reality. The reality is that the site was excavated, albeit unlawfully, and all that was uncovered were some arrowheads.

Armed with the knowledge that a dig at the site would only yield arrowheads, a more accurate calculation of archaeological value would be based on the estimated costs to the United States to recover these artifacts. The United States knew of the existence of both the Santa Clara River Gorge Shelter and the Big Round Valley archaeological sites. Given the fact that the United States had never once planned or engaged in a formal excavation at the sites, one may only speculate whether the United States would have expended any funds at all to uncover these arrowheads. Apparently, even without knowledge of what it might find, the United States was not going to expend any funds to excavate the sites. Based upon the facts of this case, the Court finds that the proffered estimates for archaeological value are both unreliable and unreasonable.

### Sentence Calculation

Hunter's base offense level is a four. *See* U.S.S.G. § 2B1.3(a). An $11,661.47 "loss," coupled with a two-level adjustment for more than minimal planning pursuant to section 2B1.3(b)(3), results in a seven-level increase in Hunter's offense level. *See* U.S.S.G. § 2B1.3(1) and § 2B1.1(b)(1)(F). Hunter's adjusted offense level is therefore an eleven. After applying a two-level downward adjustment for acceptance of responsibility (*see* U.S.S.G. § 3E1.1(a)), Hunter's guidelines offense level is a nine. An offense level of nine, when referenced to a criminal history category III, results in a guideline range of eight to fourteen months. The Court's sentence of ten months falls approximately midway within that range.

### Conclusion

For reasons discussed at length above and on the record at the October 16, 1998 sentencing hearing, the following factual findings are re-affirmed by the Court: (1) the defendant was not a leader or organizer of any criminal activity; (2) the defendant's criminal history score correctly included one point for a prior similar trespass offense; and (3) the amount of "loss" for sentencing purposes was $11,661.47.

As a final note, the Court recognizes that in cases like this, where a defendant has been convicted of damaging and looting an archaeological or cultural resource, sentencing a defendant based on the estimated dollar value of the loss, however calculated, is absurd. These speculative estimates are simply inadequate to measure the true cultural, scientific, and spiritual harm such an act causes. How can one

ever quantify the harm to a Native people whose ancestral burial grounds may have been desecrated? If Congress is indeed serious about punishing such offenders, the sentencing decision should be left to the sentencing judge who may then measure the harm in terms of his or her experience and common sense, rather than asking the judge to rely on speculative assessments and fictional scholarship in an attempt to quantify the harm in a way that bears little or no relationship to the true damage.