**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 23, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MONTE JEROME WELLS and
PHILLIP KAY LYMAN,

    Defendants - Appellants.
_____

BEAVER COUNTY, UTAH; BOX
ELDER COUNTY, UTAH; CARBON
COUNTY, UTAH; DAGGETT
COUNTY, UTAH; DUCHESNE
COUNTY, UTAH; GARFIELD
COUNTY, UTAH; IRON COUNTY,
UTAH; KANE COUNTY,
UTAH; MILLARD COUNTY, UTAH;
PIUTE COUNTY, UTAH; RICH
COUNTY, UTAH; SAN JUAN
COUNTY, UTAH; SEVIER
COUNTY, UTAH; TOOELE
COUNTY, UTAH; UTAH COUNTY,
UTAH; WASHINGTON COUNTY,
UTAH; WAYNE COUNTY, UTAH;
WEBER COUNTY, UTAH,

    Amici Curiae.

Nos. 16-4006 and 16-4007

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:14-CR-00470-DN-1 and 2)**

---

Michelle Mumford, Mumford PC, Salt Lake City, Utah, for Defendant-Appellant Monte Jerome Wells.

Phil Lyman, Blanding, Utah, filed a brief pro se.[*]

Jared C. Bennett, Assistant United States Attorney (John W. Huber, United States Attorney, and Lake Dishman, Assistant United States Attorney, with him on the brief), United States Attorney's Office, District of Utah, for Plaintiff-Appellee.

J. Mark Ward, Murray, Utah, filed an Amici Brief for Beaver, Box Elder, Carbon, Daggett, Duchesne, Garfield, Iron, Kane, Millard, Piute, Rich, San Juan, Sevier, Tooele, Utah, Washington, Wayne, and Weber Counties, Utah, in support of Defendant-Appellant Phillip Kay Lyman.

_____

Before **HARTZ**, **MURPHY**, and **HOLMES**, Circuit Judges.

_____

**HOLMES**, Circuit Judge.

_____

Recapture Canyon lies just east of Blanding in Southeastern Utah and runs south of Recapture Dam and U.S. Highway 191 along a creek. The Bureau of Land Management ("BLM") closed an area of Recapture Canyon to all-terrain vehicles ("ATVs")[1] in 2007, to prevent soil damage and the spoliation of

---

[*]     Phil Lyman appears pro se and is the Defendant-Appellant in No. 16-4007.  Having determined unanimously that oral argument would not materially assist in the resolution of that appeal, the panel took it under submission on the briefs, without oral argument.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  Citations to the appendix herein are to the appendix submitted in the companion appeal, No. 16-4006, filed by Defendant-Appellant Monte Jerome Wells (i.e., "Aplt. Wells's App.").

[1]     All-terrain vehicles will be referred to consistently as ATVs, though in the record and briefing they are sometimes designated as OHVs ("off-highway

(continued...)

archeological resources near the trail. Frustrated with what had been billed as a temporary closure—and against a backdrop of simmering tensions between federal land management agencies and some residents of Southeastern Utah—in 2014, certain individuals planned an ATV ride to protest the BLM's closure order.

The ride took place in May 2014. Defendant-Appellant Phil Lyman, a County Commissioner for San Juan County, was a major promoter of the ride. He was charged along with Defendant-Appellant Monte Wells in a misdemeanor criminal information with operating ATVs on lands closed to such use by the BLM and conspiring to do so. *See* 18 U.S.C. § 371; 43 U.S.C. §§ 1701, 1733; 43 C.F.R. § 8341.1(c).[2] Mr. Wells owned a small business and ran a website entitled *The PetroGlyph* that reported on issues of local concern in San Juan County, especially issues relating to public lands.

Following a trial, a jury found both men guilty of the charged offenses. The district court sentenced them to terms of probation and brief terms of imprisonment. They were also ordered to pay restitution for the costs of assessing and repairing the damage that the protest ride caused to the land.

On appeal, Messrs. Lyman and Wells (collectively, "Defendants-Appellants") bring a variety of challenges to their convictions and the restitution

---

[1](...continued)
vehicles") or ORVs ("off-road vehicles").

[2]     Two others were charged and tried before a jury with Defendants-Appellants; they were ultimately acquitted of the charged offenses.

order.  They ask for a new trial because the district judge (Judge Shelby) presided over their trial while a reasonable observer allegedly would have questioned his impartiality; he did ultimately recuse before their sentencing.  Furthermore, they appeal the denial of their motions to dismiss; they make a *Brady* claim stemming from the government's failure to produce a map showing a possible public right-of-way through Recapture Canyon, which allegedly would have called into question whether the BLM's 2007 closure order was lawful; they challenge the district court's restitution order and the amount they were ordered to pay; and, lastly, Mr. Lyman argues that he was denied constitutionally adequate counsel.  Because none of Defendants-Appellants' arguments are grounds for reversal of the district court's judgment, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm**.

## I.  BACKGROUND & PROCEDURAL HISTORY

San Juan County, located in the southeastern corner of Utah, is home to significant swaths of public lands managed by the BLM.  Among these, just east of the town of Blanding, is Recapture Canyon.  In 2007, the BLM closed to ATVs part of Recapture Canyon because of potential damage to the soil and archaeological sites.  *See* Notice of Closure of Public Lands to Off-Highway Vehicle (OHV) Use, 72 Fed. Reg. 57067-01 (Oct. 5, 2007).  This was intended to be a temporary order, but as of 2014, the order was still in place.  The perceived delay in reopening the area strained already tense relations between the BLM and

some local citizens.

Upset at the delay in reopening the portion of Recapture Canyon to ATV traffic, County Commissioner Phil Lyman organized a protest ride on ATVs into the closed portion of the Canyon. He was assisted in this by Monte Wells, who ran a website called *The PetroGlyph* that reported on local news of interest, particularly issues related to public lands. Mr. Wells interviewed Mr. Lyman on video and reposted Mr. Lyman's Facebook posts inviting others to the protest ride. Despite strong warnings from the BLM that criminal and civil penalties would be enforced against anyone riding an ATV in the closed section of the Canyon, the ride took place on May 10, 2014. Undisputed photographic evidence taken from within the closed area shows that Mr. Lyman and Mr. Wells rode ATVs in the protest that day.

A point of geography that requires some explanation for a full understanding of the case is that the northernmost part of the closed area of Recapture Canyon has a road where the local water district has a right-of-way to access and attend to the maintenance needs of a pipeline running from the reservoir to the north. The protest entered the closed area of Recapture Canyon on this road. To the south is a turn-around point where that road and the water district's right-of-way ends, but a trail continues further south, along which lies the majority of the archaeological and cultural resources that the BLM sought to protect. Mr. Lyman and Mr. Wells claim to have turned around at this point.

Ferd Johnson, a representative of the local water district, testified that he had consented to a request by Mr. Lyman to use the water district's right-of-way for the protest. However, the parties stipulated that the scope of the right-of-way was limited to the purposes of "operating and maintaining a pipeline." Aplt. Wells's App., Vol. IV, at 861.

After an investigation, which included an assessment of the damages, the government filed a superseding criminal information charging Defendants-Appellants with riding ATVs on lands closed to ATVs and with conspiracy to do the same. At trial, Messrs. Lyman and Wells were found guilty on both counts. Postverdict, motions were filed concerning restitution, and the court ordered Mr. Lyman to pay approximately $96,000 in restitution of which Mr. Wells was jointly and severally responsible for $48,000. The two were sentenced to probation, with a brief period of imprisonment for each. They timely appealed.

## II. DISCUSSION

On appeal, Defendants-Appellants seek a new trial because the district judge (Judge Shelby) presided over their trial while a reasonable observer allegedly would have questioned his impartiality; he did ultimately recuse before their sentencing but Defendants-Appellants contend that he should have recused earlier. Furthermore, they challenge the denial of their motions to dismiss the criminal information, the denial of a new trial based on an alleged *Brady*

-6-

violation,[3] and their restitution order.  Mr. Lyman separately argues that he was deprived of effective assistance of counsel.  We address each claim in turn.

## A.    Recusal

Judge Shelby, who presided over the trial, is close friends with Steven Bloch, the legal director for the Southern Utah Wilderness Alliance ("SUWA"), a nonprofit conservation group that was opposed to the Recapture Canyon protest ride.  After the trial, upon learning of this friendship and related matters, Defendants-Appellants filed motions to disqualify Judge Shelby from further participation in the proceeding—notably, participation in their sentencing.  Significantly, Defendants-Appellants did not move for a new trial based on the concerns underlying their motion to disqualify.

Judge Shelby recused, "conclud[ing] that recusal will promote confidence in these proceedings and avoid even the appearance of impropriety in connection with the court's sentencing duties."  Aplt. Wells's App., Vol. VI, at 1236.  More specifically, Judge Shelby recused based largely on a letter to the judge signed by SUWA and other conservation groups that expressed views adverse to Defendants-Appellants regarding sentencing, as well as evidence developed in connection with Mr. Lyman's motion to disqualify.  That evidence showed that

---

[3]    *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

SUWA had extensive pretrial involvement in the case, passing information to BLM officials and the United States Attorney's office.

Mr. Wells now argues for a new trial. He contends that Judge Shelby ought to have recused from participation in the trial *sua sponte* because a reasonable observer would have questioned his impartiality. In this regard, he argues that Judge Shelby should have been alerted to SUWA's involvement by Mr. Bloch's presence at trial as a spectator and by a voir dire question asking potential jurors whether they, their spouses, a family member, or close friend were members of SUWA. Mr. Lyman appears to make a similar argument for a new trial.[4]

The government contends that this recusal-based argument for a new trial is waived because it was not presented in posttrial motions for a new trial or acquittal. We need not opine on the waiver issue because we conclude that, in any event, Defendants-Appellants' recusal-based argument for a new trial fails on the merits. *See, e.g.*, *United States v. Black*, 773 F.3d 1113, 1115 n.2 (10th Cir. 2014) ("Because Black's SORNA claim fails on the merits, this court exercises its

---

[4] Our liberal construction of Mr. Lyman's briefing leads us to this conclusion, but we do not "assume the role of advocate." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1188 (10th Cir. 2003) (quoting *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992)). Mr. Lyman may also claim a violation of due process by reason of the judge's alleged bias. But because this requires a stronger showing than a claim for a new trial based on error in not recusing, *see Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994) (requiring a showing of actual bias or an appearance of bias strong enough to create a conclusive presumption of actual bias), and because Mr. Lyman fails to meet the lower standard applied here, we need not reach this question.

discretion to bypass the relatively complex waiver issue and resolve Black's appeal on the merits."); *Gardner v. Galetka*, 568 F.3d 862, 885 n.3 (10th Cir. 2009) ("The government argues that this claim was not raised before the district court and therefore is waived . . . . Because we conclude that this claim fails on the merits, we need not resolve whether it was waived."). We believe that it is especially appropriate to reach the merits of this issue because recusal-based arguments uniquely implicate the integrity of the justice system. *See United States v. Barrett*, 111 F.3d 947, 955 (D.C. Cir. 1997) (Tatel, J., concurring) ("Although I agree that timeliness is a factor to be considered, the obligation section 455(a) places on judges means that even an untimely recusal claim cannot deprive a circuit court of its responsibility to review a judge's failure to recuse. In my view, the integrity and public reputation of the federal judiciary require clear and firm answers on the merits to even delayed charges of judicial impropriety."). As such, though it will not always be the right discretionary choice, we believe it is important under the circumstances of this case to bypass the lack-of-preservation (i.e., waiver) issue and reach the merits of Defendants-Appellants' recusal-based argument for a new trial.

Ordinarily, arguments of the kind presented here are reviewed for an abuse of discretion. *See, e.g.*, *United States v. Higgins*, 282 F.3d 1261, 1278 (10th Cir. 2002) ("A denial of a motion for a new trial in a criminal case is reviewed for abuse of discretion."); *cf. Hinman v. Rogers*, 831 F.2d 937, 938 (10th Cir. 1987)

(per curiam) ("The decision to recuse is committed to the sound discretion of the district judge. We review the denial of a motion to recuse only for abuse of that discretion."). "Under this standard, we will not reverse unless the trial court has made 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 992 (10th Cir. 1999) (quoting *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994)). We conclude that the district court (i.e., Judge Shelby) did not abuse its discretion in failing to recuse *sua sponte* from participation in the Defendants-Appellants' trial; therefore, they are not entitled to a new trial based on this failure.

Title 28, § 455(a) of the United States Code states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This requirement is intended "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Section 455 establishes "an objective standard: disqualification is appropriate only where the reasonable person, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Id.* (quoting *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004)). In other words, a judge's subjective state of mind is irrelevant; what matters is whether "the public

might reasonably believe that [the judge] knew" of "facts creating an appearance of impropriety." *Liljeberg*, 486 U.S. at 860. The Court in *Liljeberg* approvingly quoted a similar statement from the Court of Appeals decision under review:

> "If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created[,] even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible. . . . Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances would expect that the judge would have actual knowledge."

*Id.* at 860–61 (citation omitted). "In conducting this review, we must ask how these facts would appear to a well-informed, thoughtful and objective observer," who is "an average member of the public," not a "hypersensitive, cynical, and suspicious person." *Mathis*, 787 F.3d at 1310 (quoting *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004)).

Courts begin by asking "whether a reasonable factual basis exists for questioning the judge's impartiality," mindful that "cases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (first quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993); then quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)); *accord Bryce v. Episcopal*

*Church in the Diocese of Col.*, 289 F.3d 648, 659 (10th Cir. 2002). Judges not only have a strong duty to recuse when appropriate, but also a strong duty to sit, and the statute "must *not* be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Nichols*, 71 F.3d at 351 (emphasis added) (quoting *Cooley*, 1 F.3d at 993). A new trial may be an appropriate remedy if the judge's impartiality during the trial could have reasonably been questioned. *See United States v. Nickl*, 427 F.3d 1286, 1297–98 (10th Cir. 2005). On the record before us, however, Judge Shelby's decision to not recuse *sua sponte* from participation in Defendants-Appellants' trial cannot be characterized as arbitrary or manifestly unreasonable. Plainly stated, Judge Shelby did not err in failing to recuse. Consequently, Defendants-Appellants were not entitled to a new trial based on this failure.

First, many of the allegations of partiality raised on appeal ultimately stem from various adverse rulings against Defendants-Appellants.[5] *E.g.*, Aplt. Wells's

---

[5] In some instances, Mr. Wells complains of decisions that cannot even be properly characterized as adverse to Defendants-Appellants. Aplt. Wells's Opening Br. at 42 (complaining of the judge calling for a break "during a particularly effective portion of Mr. Wells' cross-examination of Mr. Palma," where defense counsel was asked by the court whether that moment was convenient for a break and defense counsel assented); *id.* (complaining of the judge "speaking for the government" where the judge merely suggested that the government could stipulate that a photograph did not represent a closure sign on the road in Recapture Canyon rather than having the defense elicit that from a

(continued...)

Opening Br. at 36–39 (complaining of adverse rulings by the court during voir dire); *id.* at 40–41 (complaining of an adverse evidentiary ruling); Aplt. Lyman's Opening Br. at 20 (complaining of an unspecified evidentiary ruling or rulings); *id.* at 22 (alleging that bias infected the court's rulings on motions in limine, voir dire, jury instructions, and evidentiary rulings); *id.* at 23–24 (complaining of the court's rejection of a motion in limine and its criticism of Mr. Lyman's attorney for filing a motion to exclude within days of trial).  But "adverse rulings cannot in themselves form the appropriate grounds for disqualification."  *Nickl*, 427 F.3d at 1298 (quoting *Green v. Branson*, 108 F.3d 1296, 1305 (10th Cir. 1997)).  Likewise, a "'judge's ordinary efforts at courtroom administration,' even if 'stern and short-tempered' are 'immune' from charges of bias and partiality," and even allegations of "'critical,' 'disapproving,' or 'hostile'" judicial remarks are insufficient.  *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)).  To be sure, remarks made in the course of trial *may be* sufficient to require a new trial *if* "they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Liteky*, 510 U.S. at 555.  But Defendants-

---

[5](...continued)
witness; the government promptly agreed to so stipulate); *id.* at 42–43 (complaining of the judge's timing in informing the jury of the parties' stipulation that the San Juan Water Conservancy District held a limited right-of-way within Recapture Canyon, where the defendants did not object).

Appellants fail to point to any such remarks or conduct here.

The real crux of Defendants-Appellants' arguments lies in the friendship between Judge Shelby and Mr. Bloch, SUWA's legal director. Judge Shelby had a standing practice of recusing himself from cases in which Mr. Bloch makes an appearance. *See* Aplt. Wells's App., Vol. VI, at 1106–07 (Tr. Status Conf. for *Jointly Managed R.S. 2477 Road Cases Litig.*, 2:10-cv-1073; 2:11-cv-1045, dated May 26, 2015). However he did not otherwise refrain from presiding over cases involving SUWA. *Id.* Defendants-Appellants allege that this friendship calls into question the judge's impartiality.

More specifically, they contend that a reasonable observer would have questioned Judge Shelby's impartiality when the fact of this friendship is combined with (1) SUWA's extensive pretrial involvement in the case, notably, passing information to both the offices of the U.S. Attorney and the BLM in Utah, (2) Mr. Bloch's presence as a spectator at trial, and (3) a voir dire question asking potential jurors whether they, a family member, or a close friend was a member of SUWA. Aplt. Wells's Opening Br. at 36–37. In effect, they argue that since the judge recused himself for purposes of sentencing, he also should have recused *sua sponte* earlier—in light of the foregoing factors—before presiding over their trial.

But it is not apparent to us that the mere fact that Judge Shelby's friend was the litigation director for SUWA—an organization that admittedly had taken public positions against the use of ATV vehicles in Recapture Canyon and in

support of Defendants-Appellants' indictment and trial—would have caused a reasonable observer to question Judge Shelby's impartiality in presiding over Defendants-Appellants' trial. We can find no case, nor do Defendants-Appellants point to any, even suggesting that recusal is required under these circumstances. In this regard, we note that SUWA was not a party to this criminal prosecution, nor had Mr. Bloch entered an appearance.

Further, at no point before or during trial would a reasonable observer who knows the relevant facts have expected Judge Shelby to have known of SUWA's extensive pretrial involvement in the case. Neither Mr. Bloch's presence as a spectator at the trial nor the voir dire question reasonably could have given Judge Shelby a basis to know of SUWA's pretrial involvement. We cannot discern, nor do Defendants-Appellants suggest, how Judge Shelby *could* have inferred SUWA's involvement from those facts, much less that he *should* have so inferred.

Thus, even assuming *arguendo* that such pretrial involvement by SUWA militated in favor of Judge Shelby's recusal, when viewed in the context of his close friendship with SUWA's litigation director (Mr. Bloch), and the other factors discussed herein, the record reveals no facts that would have caused a reasonable observer to believe that Judge Shelby should have known of SUWA's pretrial involvement. Therefore, this circumstance could have no bearing on the recusal analysis.

In sum, we conclude that Judge Shelby did not abuse his discretion in not

granting a new trial to Defendants-Appellants due to his failure to recuse *sua sponte* from participation in their trial. Defendants-Appellants have not shown that his judgment was arbitrary, capricious, whimsical, or manifestly unreasonable, and therefore their recusal-based argument for a new trial fails.

**B.     Motions to Dismiss**

The Defendants-Appellants challenge the denial of their motions to dismiss. Each raises different arguments. Mr. Wells appears to claim that he cannot be prosecuted for his activities because they were protected under the First Amendment. Mr. Lyman argues that the government failed to adequately allege interdependence, a required element of conspiracy. We address the arguments of each in turn.

"We generally review a district court's denial of a motion to dismiss a criminal indictment for abuse of discretion." *United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015). However, embedded issues of law are reviewed de novo. *See United States v. Barrett*, 496 F.3d 1079, 1091 (10th Cir. 2007) (considering a double-jeopardy challenge de novo); *see also United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (noting that "[w]e review the [legal] sufficiency of an indictment *de novo*"); *United States v. Giles*, 213 F.3d 1247, 1248–49 (10th Cir. 2000) ("Generally, we review the grant or denial of a motion to dismiss an indictment for an abuse of discretion. However, when the dismissal involves issues of statutory interpretation, or when the sufficiency of a charge is

challenged, we review the district court's decision de novo." (citation omitted)).

### 1. *Mr. Wells*

Mr. Wells seems to argue that his motion to dismiss ought to have been granted on the grounds that he could not be prosecuted for his First Amendment-protected activities. More specifically, he argues that he could not be prosecuted because the manner and means of the alleged conspiracy in which he participated consisted solely of protected speech. *See* Aplt. Wells's Opening Br. at 44–50.

We have stated before, in the context of a claimed bar to prosecution under the First Amendment "[t]hat this court must 'view claims of a "right not to be tried" with skepticism, if not with a jaundiced eye.'" *United States v. Quaintance*, 523 F.3d 1144, 1146 (10th Cir. 2008) (quoting *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994)). We have held that the First Amendment may be the basis for a bar to prosecution where the exercise of First Amendment rights motivates "hostility" on the part of prosecutors. *United States v. P.H.E., Inc.*, 965 F.2d 848, 860 (10th Cir. 1992) (quoting *United States v. Raymer*, 941 F.2d 1031, 1042 (10th Cir. 1991)).

More specifically, the defendant has the burden of proof and is obliged to establish at the outset "(1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness." *Id.* (quoting *Raymer*, 941 F.2d at 1040). "Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons."

-17-

*Raymer*, 941 F.2d at 1040. At this juncture, courts inquire "whether, 'as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred *but for* the hostility . . . towards the defendant because he exercised his specific legal rights.'" *Id.* at 1042 (emphasis added) (quoting *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982)); *see P.H.E., Inc.*, 965 F.2d at 860 (describing this inquiry as "the polestar to guide the district court").

Mr. Wells argues that the prosecution's hostility became evident only post-trial, when showings were made that SUWA had pushed for prosecution of the Recapture Canyon riders and also regularly passed Mr. Wells's social-media postings on to prosecutors. But nowhere does he present any *evidence* of prosecutorial hostility towards Mr. Wells's exercise of his First Amendment rights. Even the emails from SUWA officials to BLM officials reveal at most that SUWA was simply interested in "protect[ing] the resources of Recapture Canyon" against the perceived-to-be-illegal ride, and not in limiting Mr. Wells's First Amendment rights. Aplt. Wells's App., Vol. VI, at 1135; *see id*. at 1120–46. As noted, defendants have the burden of establishing actual vindictiveness or establishing a realistic likelihood of vindictiveness. Mr. Wells has done neither.

### 2. *Mr. Lyman*

Mr. Lyman argues that the district court erred in denying his motion to dismiss. He states cursorily and without argument that the government failed to

-18-

allege interdependence, a required element of conspiracy. Even given our liberal construction of pro se briefing, Mr. Lyman has not adequately presented this argument in his opening brief; accordingly, we may deem it waived. *See United States v. Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011) (noting that we will not "make arguments for" a litigant); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."). In any event, the argument fails.

To determine the sufficiency of an indictment we apply a two-part test: "First, the indictment must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet; second, it must be such as to show to what extent he may plead a former acquittal or conviction as a bar to further prosecution for the same cause." *Berres*, 777 F.3d at 1089 (quoting *United States v. Salazar*, 720 F.2d 1482, 1486 (10th Cir. 1983)). Mr. Lyman's argument implicates only the first prong of this test.

"Interdependence exists where coconspirators 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged.'" *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (quoting *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992)). However, in dealing with a charging document alleging conspiracy, we require only that it "contain the essential elements upon which the underlying offense rests," and those elements "need not be charged with the same degree of specificity as would ordinarily be required in

-19-

a prosecution based on the underlying offense." *United States v. Bedford*, 536

F.3d 1148, 1156 (10th Cir. 2008) (quoting *United States v. Daily*, 921 F.2d 994,

999 (10th Cir. 1990), *overruled on other grounds by United States v. Gaudin*, 515

U.S. 506 (1995)).  With regard to interdependence, so long as the charging

document "describe[s] the interdependent behavior of the coconspirators," it is

sufficient.  *Id.* at 1157.

Here, the superseding information adequately set out how Mr. Lyman and

Mr. Wells interdependently worked together to publicize their plans to ride ATVs

in the closed portion of Recapture Valley and then rode the trail.  Specifically, it

alleges how the Defendants-Appellants worked together to:

> publish[ ] and promote[ ] on various social media websites an
> invitation . . . to the public to join the proposed ATV ride
> through the off-road vehicle restricted area . . . .  [They] filmed
> a three-part video interview in which they discussed the nature,
> the origin, and plans of the proposed ATV ride through the off-
> road vehicle restricted area . . . .  [They] promoted [that] video
> interview . . . on various social media websites.

Aplt. Wells's App., Vol. I, at 40.  These specific allegations sufficiently aver that

the Defendants-Appellants worked together for their mutual benefit in the context

of their conspiracy to ride ATVs on the closed portion of Recapture Canyon in

protest of BLM's 2007 closure order.  The superseding information's allegations

of interdependence are sufficient.  Mr. Lyman's motion-to-dismiss argument thus

fails.[6]

## C.    Mr. Wells's Insufficiency of the Evidence Claim

Mr. Wells argues essentially that the government failed to introduce

sufficient evidence that he was acting as a coconspirator rather than as a

journalist.  *See* Wells's Reply Br. at 16–18.  "We engage in de novo review of the

sufficiency of the evidence to support the conviction . . . .  [W]e treat the

evidence in the light most favorable to the Government and ask whether a rational

fact-finder could have concluded beyond a reasonable doubt that the defendant

was guilty."  *United States v. Kamahele*, 748 F.3d 984, 1002 (10th Cir. 2014)

(citation omitted).  In doing so, we ask simply "whether [the] evidence, if

believed, would establish each element of the crime."  *Id.* (quoting *United States

v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004)).  Here, the relevant

_____

[6]    Though there is little indication of it, the government seems to understand Mr. Lyman to be making an argument regarding the lawfulness of the BLM's 2007 closure order in the context of challenging the district court's decision regarding his motion to dismiss.  *See* Aplee.'s Br. at 31 (including a subsection entitled "Recapture Canyon was lawfully closed to OHVs").  Insofar as Mr. Lyman is actually making such an argument in the motion-to-dismiss context, we deem it to be too bare-bones to warrant appellate consideration and thus declare it waived.  *See, e.g.*, *United States v. Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009) ("Under our precedent, this skeletal reference is insufficient to raise the ex parte/disclosure concern as a discrete appellate issue.").  That said, Mr. Lyman's briefing, generously construed, does join Mr. Wells's attack on the legality of the 2007 closure order in mounting a challenge based on suppressed evidence.  We fully address that challenge *infra* and find it to be without merit.

crime is a conspiracy, under 18 U.S.C. § 371, to violate the BLM's 2007 closure order.

"A conviction of conspiracy under 18 U.S.C. § 371 requires: (1) an agreement, (2) to break the law, (3) an overt act, (4) in furtherance of the conspiracy's object, and (5) proof that the defendant wilfully entered the conspiracy." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005). Here, Mr. Wells appears to challenge the sufficiency of the evidence on the element of the existence of an agreement, insofar as he claims to have been acting as a journalist rather than a coconspirator.

The evidence presented by the government, however, was sufficient for a jury to find beyond a reasonable doubt that Mr. Wells acted not merely as a journalist reporting on issues important to his local community, but as a coconspirator who agreed with Mr. Lyman to ride a portion of the closed Recapture Canyon trail on ATVs. More specifically, Mr. Wells reposted Mr. Lyman's advertisements of the ATV protest ride, often adding flourishes of his own that suggested active support for and agreement with the planned ride on the closed portion of Recapture Canyon.

For example, the government's trial exhibit 73 is largely a reposting of an announcement by Mr. Lyman, but with the addition of the text "Show your support click 'Like' and Share!" and a large, iconic image of Uncle Sam pointing at the reader and stating "We Need You!!!" Aplee.'s Supp. App., Vol. I, at

177–78 (*PetroGlyph* posting entitled "Recapture—Our Public Lands," May 10, 2014); *see also id.* at 193 (*PetroGlyph* Facebook posting of same statement of Mr. Lyman, dated May 7) (added epigraph stating: "Twenty years from now you will be more disappointed by the things that you didn't do than by the ones you did do."). That posting further states: "It is only motorized machines that are deemed unfit (by the BLM) for these trails. I for one plan to be riding an ATV, carefully and respectfully, on these well established trails which have existed in this canyon for many many many years." *Id.* at 177.

In a video interview of Mr. Lyman conducted by Mr. Wells, in addition to generally agreeing with Mr. Lyman's plans and reasons for the protest ride, Mr. Wells twice implies that he has agreed to ride on the trail with Mr. Lyman. *See* Aplee.'s Supp. App., Vol. I, at 184 (Disc 3 Video Clip (conventionally filed)) ("[The BLM's officials] haven't been willing to come down and show you where [cultural sites] are so *we* can avoid it?" (16:23) (emphasis added)); *id.* ("*We've* got some issues with the trail itself, where it hasn't been maintained for the last eight years, seven years, and so there's some places you can't get through unless *we* do some trail maintenance . . . . That may prevent *us* from riding parts of it or whatever. But there's still some trails that have roads in them that *we're* looking at." (19:33) (emphasis added)). Taken together with the evidence showing that Mr. Wells in fact rode the closed portion of the trail on an ATV, the jury could infer that Mr. Wells knowingly and voluntarily agreed with Mr. Lyman to ride

ATVs in the closed portion of Recapture Canyon. The evidence presented was legally sufficient to sustain a conviction for conspiracy.

## D.    *Brady* **Claims**

Defendants-Appellants next contest the district court's denial of their motion for a new trial based on the posttrial discovery of a 1979 map allegedly showing a Revised Statute ("R.S.") 2477[7] right-of-way that the

---

[7]      Our 2005 decision in *Southern Utah Wilderness Alliance v. Bureau of Land Management ("SUWA v. BLM")*, 425 F.3d 735 (10th Cir. 2005), offers an excellent primer on R.S. 2477. Rather than reinvent the wheel here, we are content to share this discussion:

> In 1866, Congress passed an open-ended grant of "the right of way for the construction of highways over public lands, not reserved for public uses." This statute, commonly called "R.S. 2477," remained in effect for 110 years, and most of the transportation routes of the West were established under its authority. During that time congressional policy promoted the development of the unreserved public lands and their passage into private productive hands; R.S. 2477 rights of way were an integral part of the congressional pro-development lands policy.
>
> In 1976, however, Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership [by passing the Federal Land Policy and Management Act of 1976], with an increased emphasis on conservation and preservation. As part of that statutory sea change, Congress repealed R.S. 2477. There could be no new R.S. 2477 rights of way after 1976. But even as Congress repealed R.S. 2477, it specified that any "valid" R.S. 2477 rights of way "existing on the date of approval of this Act" (October 21, 1976) would continue in effect. The statute thus had the effect of "freezing" R.S. 2477 rights as they were in 1976.

(continued...)

-24-

The difficulty is in knowing what that means. Unlike any other federal land statute of which we are aware, the establishment of R.S. 2477 rights of way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested. As the Supreme Court of Utah noted 75 years ago, R.S. 2477 "'was a standing offer of a free right of way over the public domain,'" and the grant may be accepted "without formal action by public authorities." In its *Report to Congress on R.S. 2477: The History and Management of R.S. 2477 Rights-of-Way Claims on Federal and Other Lands*, the Department of the Interior explained that R.S. 2477 highways "were constructed without any approval from the federal government and with no documentation of the public land records, so there are few official records documenting the right-of-way or indicating that a highway was constructed on federal land under this authority."

To make matters more difficult, parties rarely had an incentive to raise or resolve potential R.S. 2477 issues while the statute was in effect, unless the underlying land had been patented to a private party. If someone wished to traverse unappropriated public land, he could do so, with or without an R.S. 2477 right of way, and given the federal government's pre-1976 policy of opening and developing the public lands, federal land managers generally had no reason to question use of the land for travel. Roads were deemed a good thing. Typical was the comment by the great nineteenth-century Michigan jurist, Thomas Cooley, that "[s]uch roads facilitate the settlement of the country, and benefit the neighborhood, and in both particulars they further a general policy of the federal government. But they also tend to increase the value of the public lands, and for this reason are favored." Thus, all pre-1976 litigated cases involving contested R.S. 2477 claims (and there are dozens) were between private landowners who had obtained title to previously-public land and would-be road users who defended the right to cross

(continued...)

government failed to disclose before trial. Defendants-Appellants make two separate arguments: (1) they contend that the 1979 map would have permitted them to establish the existence of an R.S. 2477 right-of-way to negate the legality of BLM's 2007 closure order, as applied to the portion of the Recapture Canyon

---

[7](...continued)
> private land on what they alleged to be R.S. 2477 rights of way.
>
> Now that federal land policy has shifted to retention and conservation, public roads and rights of way in remote areas appear in a different light. Some roads and other rights of way are undoubtedly necessary, but private landowners express the fear that expansive R.S. 2477 definitions will undermine their private property rights by allowing strangers to drive vehicles across their ranches and homesteads. Conservationists and federal land managers worry that vehicle use in inappropriate locations can permanently scar the land, destroy solitude, impair wilderness, endanger archeological and natural features, and generally make it difficult or impossible for land managers to carry out their statutory duties to protect the lands from "unnecessary or undue degradation." They argue that too loose an interpretation of R.S. 2477 will conjure into existence rights of way where none existed before, turning every path, vehicle track, or dry wash in southern Utah into a potential route for cars, jeeps, or off-road vehicles. For their part, the Counties [of southern Utah] assert that R.S. 2477 rights of way are "major components of the transportation systems of western states," and express the fear that federal land managers and conservationists are attempting to redefine those rights out of existence, with serious "financial and other impacts" on the people of Utah. Thus, the definition of R.S. 2477 rights of way across federal land, which used to be a non-issue, has become a flash point, and litigants are driven to the historical archives for documentation of matters no one had reason to document at the time.

*Id.* at 740–742.

trail on which they rode; and (2) they argue that they at least should have been able to present the map as evidence relevant to their good-faith defense, since a violation of the law under which they were convicted requires that a defendant acted knowingly and willfully.  *See* Aplt. Wells's Opening Br. at 50–57.[8]  Thus, the Defendants-Appellants contend that the district court erred in not granting them a new trial to use the map in these ways.[9]  The government argues that no

---

[8]     Mr. Lyman appears to disclaim any desire to raise an R.S. 2477 defense yet states that he did raise it "as a matter of uncontested fact."  *See* Aplt. Lyman's Opening Br. at 29–30.  Construing this liberally in light of his reply brief, he appears to argue that it is a fact that they were on a county R.S. 2477 right-of-way.  *See* Aplt. Lyman's Reply Br. at 17–26.  However, Mr. Lyman does not offer legal argument in support of this assertion of "fact," nor does he clearly explain why the district court erred in failing to grant him a new trial on this basis.  Without crossing the line of being his advocate, *see, e.g.*, *Hall v. Belmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), we give Mr. Lyman, insofar as his filings plausibly may be read to assert similar contentions, the benefit of Mr. Wells's arguments.

[9]     In passing, Mr. Wells asserts that the prosecutor, in his closing argument, infringed on his constitutional right not to testify.  He argues that the prosecutor commented on his choice not to testify by pointing out that no evidence had been introduced showing that the permission to use the pipeline right-of-way that Mr. Ferd Johnson had given to Mr. Lyman had ever been communicated to any other defendant:

> Let's discuss briefly what Mr. Johnson said and what he did not say.  The only testimony from Mr. Johnson was that he spoke with Mr. Lyman in March of 2014 and said it was okay.  There was no testimony from Mr. Johnson ever that he spoke with Mr. Wells, [or the other two defendants, who were ultimately acquitted] giving them permission to use the right-of-way, and no evidence has been produced from Mr. Johnson, from the Government's witnesses or from any of the exhibits admitted into evidence suggesting that Mr. Lyman ever communicated that

(continued...)

-27-

*Brady* violation occurred because the map in question is not material.

We review de novo the existence of a *Brady* violation. *See United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). Proving a *Brady* claim requires the defendant to show by a preponderance of the evidence (1) that the government suppressed evidence, (2) that the evidence was favorable to the defendant, and (3) that the evidence was material. *See id.*; *accord United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir. 2005). Only the materiality element is at issue on appeal.

Materiality requires "a reasonable probability that the result of the

---

[9](...continued)
> to any of the other Defendants. Thus, they can't avail themselves of some permission that they never heard about.

Aplt. Wells's App., Vol. IV, at 918.

Mr. Wells did not raise this argument below, as he concedes in his reply brief, but he argues that comments on a defendant's failure to testify are plain error. *See* Aplt. Wells's Reply Br. at 25–26. Even if this generally were true, the prosecutor's comments could not be deemed improper here because it was not the case that "the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) (quoting *Pickens v. Gibson*, 206 F.3d 988, 998 (10th Cir. 2000)). A prosecutor is "free to comment on a defendant's failure to call certain witnesses or present certain testimony." *Id.* (quoting *Pickens*, 206 F.3d at 999). But the prosecutor here did not even go that far. Instead, his phrasing shows a careful attention *not* to comment on the fact that the Defendants-Appellants themselves did not offer testimony. The prosecutor limited himself to calling the jury's attention to the absence of proof relevant to the Defendants-Appellants' good-faith defense, as reflected in the limits of Mr. Johnson's and the government witnesses' testimony, as well as the exhibits that had been introduced into evidence. This does not amount to an improper comment on the Defendants-Appellants' decision not to testify.

proceeding would have been different had the evidence been disclosed." *Reese*, 745 F.3d at 1083; *accord Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Put differently, "the likelihood of a different result [must be] great enough to undermine confidence in the outcome." *United States v. Garcia*, 793 F.3d 1194, 1205 (10th Cir. 2015) (quoting *Reese*, 745 F.3d at 1083)).

### 1.    *Materiality for a Good-Faith Defense*

We conclude that the map could not have been material for purposes of the Defendants-Appellants' good-faith defense. As the district court pointed out, the map cannot even be relevant on this point because Defendants-Appellants were unaware of the map at the time of the ATV ride. *See* Aplt. Wells's App., Vol. VII, at 1326 n.45 (Mem. Decision & Order Den. Mot. for New Trial, dated Oct. 22, 2015). On appeal, the Defendants-Appellants do not contest their lack of knowledge of the map. Rather, they (or, more precisely, Mr. Wells; Mr. Lyman's briefing on this point is unclear), argue that the map, despite the fact that it was unknown to them, "lends credence to the fact that the county road and its R.S. 2477 right-of-way was well-known in the county," Aplt. Wells's Reply Br. at 22, and that "this map could have been used to bolster their *suspicion* that they were on a historical right-of-way, but lacked the evidence to prove [it]." Aplt. Wells's Opening Br. at 54.

However, although the Defendants-Appellants thus argue that the R.S. 2477 right-of-way was well known, they do not argue that *they* subjectively believed in

-29-

its existence—the relevant question for their good-faith defense. Further, although Mr. Wells now claims that he had a *suspicion* that a right-of-way existed, a suspicion is not an "honest belief" that the road was not legally closed to ATV use. *See United States v. Chavis*, 461 F.3d 1201, 1208–09 (10th Cir. 2006) (discussing availability of good-faith defense to the intent-to-deceive element of mail fraud); *cf. United States v. Duncan*, 850 F.2d 1104, 1116 (6th Cir. 1988) (stating that the district court "correctly noted that an instruction [for a good-faith defense] should not be given 'if it lacks evidentiary support or is based upon mere suspicion or speculation'" (quoting *United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987)), *overruled on other grounds by Schad v. Arizona*, 501 U.S. 624 (1991)). Accordingly, Defendants-Appellants cannot establish that the 1979 map would have been material to their good-faith defense.

### 2. *Materiality for an R.S. 2477 Defense*

Mr. Wells argues that the map is material because it proves the existence of an R.S. 2477 right-of-way on the road the protest was held on and that such a right-of-way would undo the legality of the BLM's 2007 closure order. Put another way, he reasons that the right-of-way would have established that the BLM did not have the authority to prohibit Defendants-Appellants' ATV use on that road. However, the district court held, following an earlier District of Utah decision in *United States v. Jessop*, Nos. 2:08-CR-245-TC, 2:06-CR-553-RTB, 2010 WL 5395091 (D. Utah Dec. 27, 2010) (unpublished), that criminal

-30-

defendants do not have "standing" to raise an unadjudicated R.S. 2477 defense and so the map is not admissible evidence. *See* Aplt. Wells's App., Vol. VII, at 1322.

In this regard, we have repeatedly held, in the context of civil actions to establish R.S. 2477 right-of-ways, that the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, is the "exclusive means by which adverse claimants [can] challenge the United States' title to real property." *Kane Cty. v. United States*, 772 F.3d 1205, 1210 (10th Cir. 2014) (quoting *Block v. North Dakota*, 461 U.S. 273, 286 (1983)); *accord San Juan Cty. v. United States*, 754 F.3d 787, 793 (10th Cir. 2014); *Sw. Four Wheel Drive Assoc. v. Bureau of Land Mgmt.*, 363 F.3d 1069, 1071 (10th Cir. 2004); *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978). Importantly, we also have ruled that individual members of the public do not have a cognizable claim to public roads; more specifically, they cannot satisfy the QTA requirement to "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property." *Sw. Four Wheel Drive*, 363 F.3d at 1071 (quoting 28 U.S.C. § 2409a(d)); *Kinscherff*, 586 F.2d at 160 ("Members of the public as such do not have a 'title' in public roads . . . . Thus the 'interest' plaintiffs seek to assert as part of the public is not of such a nature to enable them to bring a suit to quiet title."). The district court relied on the reasoning underlying these authorities to conclude that Defendants-Appellants lacked standing to raise a R.S. 2477 defense.

However, Mr. Wells stresses that—unlike the civil cases that the district court relied on—Defendants-Appellants do not seek to quiet title to land against the United States; that is, they do not seek to claim title to, or an interest in, the Recapture Canyon trail. Rather, in their criminal prosecution, they seek to present evidence of an R.S. 2477 right-of-way to attack the legality of the BLM's 2007 closure order. If the BLM did not have the lawful authority to prohibit them from using ATVs on the route that they traveled because it was an unadjudicated R.S. 2477 right-of-way, then Defendants-Appellants contend that their conduct could not have been illegal.

Mr. Wells contends that they must be permitted to raise such a defense in a criminal setting; otherwise, their due-process rights will be infringed. The government rejects this due-process concern. Specifically, it asserts that due-process arguments must be predicated on the deprivation of an individual's substantive right, and since neither Defendant-Appellant has such an individual right (i.e., "standing") to establish the R.S. 2477 right-of-way, no due-process violation can result from denying them the opportunity to present evidence of such a right-of-way.

Ultimately, we conclude that, even assuming that Defendants-Appellants were entitled to present evidence regarding the existence of an R.S. 2477 right-of-way on their travel route in mounting a defense to their criminal charges, and that such a defense could establish the illegality of the BLM's 2007 closure order, the

district court did not err in denying Defendants-Appellants a new trial because the 1979 map was not material within the meaning of *Brady*.

Before explaining the basis for this conclusion, we pause to identify one factor that does *not* undergird it: that is, the Defendants-Appellants' purported lack of "standing" to seek the adjudication of an R.S. 2477 right-of-way under the QTA. We think this factor is irrelevant and only serves to muddy and confuse the analysis. We must therefore respectfully part company with the district court's reasoning, which the government embraces. The term "standing" typically denotes a matter of jurisdiction. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88 (1998) ("Petitioner, however, . . . has raised the issue of respondent's standing to maintain the suit, and hence this Court's jurisdiction to entertain it.").

However, it is clear that the district court here had constitutional jurisdiction under Article III of the Constitution to adjudicate this criminal case. *See Bond v. United States*, 564 U.S. 211, 217 (2011) (reversing the Third Circuit's holding that a criminal defendant lacked standing to raise a Tenth Amendment challenge to a federal statute because any rights under the Tenth Amendment accrued not to the defendant but to the states, and holding that the defendant-appellant's "challenge to her conviction and sentence 'satisfies the case-or-controversy requirement, because the incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the

-33-

conviction.'" (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998))).  And it is equally patent that the court possessed statutory jurisdiction under 18 U.S.C. § 3231.  *See, e.g.*, *United States v. Collins*, 920 F.2d 619, 629 (10th Cir. 1990) (noting that purported defense counsel's "memorandum blithely ignored 18 U.S.C. § 3231 which explicitly vests federal district courts with jurisdiction over 'all offenses against the laws of the United States'"); *United States v. Tony*, 637 F.3d 1153, 1158 (10th Cir. 2011) ("The district court had jurisdiction.  18 U.S.C. § 3231."); *cf. United States v. DeVaughn*, 694 F.3d 1141, 1146, 1153 (10th Cir. 2012) (rejecting the view that "a charging document's failure to state an offense affects a federal court's jurisdiction, and noting that "[a] claim that a criminal statute is unconstitutional [as applied to the defendant] does not implicate a court's subject matter jurisdiction").

Moreover, the Supreme Court has made clear that courts err by characterizing as a question of "standing" the issue of whether a particular litigant is authorized to bring a substantive claim under a statute.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377, 1387 (2014) ("Although we admittedly have placed [the zone-of-interests] test under the 'prudential' [standing] rubric in the past, it does not belong there . . . .  Whether a plaintiff comes within 'the "zone of interests"' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."

-34-

(citation omitted)); *Bond*, 564 U.S. at 218–19 (holding that *Tennessee Electric Power Co. v. TVA*, 306 U.S. 118 (1939), had improperly conflated the merits question of whether the plaintiff in that case had a cause of action with the justiciability question of whether the plaintiff had standing to raise a federalism challenge).

Thus, the question that courts have *misguidedly* used the term "standing" to describe in the QTA context is really whether a particular litigant is a member of a class that Congress has authorized to sue to quiet title against the United States. And that question is *not* relevant in this criminal prosecution. As noted, Defendants-Appellants do not seek to quiet title against the United States under the QTA; instead, they seek to present a defense that challenges the legality of the BLM's 2007 order by presenting evidence that the order unlawfully barred their use of an R.S. 2477 right-of-way. Thus, for purposes of our ultimate conclusion, we do not consider Defendants-Appellants' "standing"—in particular, as it relates to the QTA—to be relevant.

However, partly due to the misdirected efforts and "confusion," *Bond*, 564 U.S. at 219, in the parties' briefing relating to the standing question, we deem it most fair and efficient to predicate our analysis on two key assumptions. These assumptions will permit us to move more directly to the heart of the matter—i.e, materiality—and to bypass the constitutional question of whether Defendants-Appellants' due-process rights would be violated if they are prevented from

-35-

mounting an R.S. 2477 defense to their criminal charges. *See, e.g.*, *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996) ("The Supreme Court has long endorsed, if not always adhered to, the notion that federal courts should address constitutional questions only when necessary to a resolution of the case or controversy before it."); *accord Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 508 (1st Cir. 2011) ("The court declined to adhere to the doctrine of constitutional avoidance on the ground that it felt resolution of a constitutional due process question was inevitable in the case before it. A decision on a constitutional due process question was not necessary, was not inevitable, had considerable impermissible consequences, and contravened the rule of constitutional avoidance."); *cf. Prost v. Anderson*, 636 F.3d 578, 594 (10th Cir. 2011) (declining "to depart from our general practice [of not considering arguments for reversal not adequately presented in the opening brief] in this case, given that significant and largely uncharted questions of the Constitution's meaning, questions whose proper outcome is far from certain, hang in the balance").

First, we assume, without deciding, that Defendants-Appellants may present an R.S. 2477 defense in their criminal case as a means of attacking the legality of the BLM's 2007 closure order. Second, we similarly assume that Defendants-Appellants are correct that *if* an R.S. 2477 right-of-way exists, and its scope included ATV use, *then* the BLM lacked the authority to close the area in

-36-

question to ATV use.

We make these two assumptions—both favorable to Defendants-Appellants—without prejudicing the government because, even with the benefit of them, Defendants-Appellants cannot prevail. The district court did not err in denying their motion for a new trial.

Generally speaking, under our precedents, establishing an R.S. 2477 right-of-way requires showing, *inter alia*, that it had been "'accepted' by the public" before the repeal of R.S. 2477. *SUWA v. BLM*, 425 F.3d at 770; *see id.* at 741 ("[Repeal of R.S. 2477] had the effect of 'freezing' R.S. 2477 rights as they were in 1976." (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1081 (10th Cir. 1988), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992)(en banc)). Determining the existence and scope of an R.S. 2477 route is an evidence-intensive inquiry.[10] *See id.* at 772–76

---

[10] We recognize that, in the context of the QTA, the existence and scope of a right-of-way or, more generally, an easement, is an issue for the judge. *See* 28 U.S.C. § 2409a(f) ("A civil action against the United States under [the Quiet Title Act] shall be tried by a court without a jury."). Utah law follows a somewhat similar approach. *See Conatser v. Johnson*, 194 P.3d 897, 900 (Utah 2008) ("Determining the scope of an easement is a question of law."); *Valcarce v. Fitzgerald*, 961 P.2d 305, 311 (Utah 1998) ("The finding that an easement exists is a conclusion of law. Such a finding is, however, the type of highly fact-dependent question . . . which accords the trial judge a broad measure of discretion . . . ."). On this basis, the government contends that Defendants-Appellants' R.S. 2477 defense cannot be material. *See* Aplee.'s Br. at 35. The underlying premise of the government's argument appears to be that evidence relevant to a ruling made by a judge—as opposed to a factual finding made by a

(continued...)

(surveying Utah and other states' cases making use of extensive historical evidence to establish the extent and nature of use over the required period); *see also San Juan Cty.*, 754 F.3d at 791 (describing broadly the evidence presented over the course of a "nine-day bench trial" involving the determination of the existence of an R.S. 2477 route); *cf. SUWA v. BLM*, 425 F.3d at 743 (describing preliminary BLM determination of an R.S. 2477 route as involving "review[] [of] a variety of documents, including U.S. and county public land records and surveys, maps and aerial photography, wilderness inventory records, and BLM

---

[10](...continued)
jury—cannot, as a categorical matter, constitute *Brady* material.

Under the circumstances of this case, we are not persuaded by the government's argument, though we need not definitively opine on the matter. Suffice it to say that the weaknesses of the government's argument in this case do not legally preclude us from assuming that Defendants-Appellants could make a *Brady* argument based on the suppression of evidence pertinent to an R.S. 2477 defense. First of all, it is not self-evident at all that the procedures for establishing the R.S. 2477 issue in the QTA context (i.e., a proceeding solely before a judge) would have any relevance in the criminal-prosecution context, much less be controlling, and the government cites no authority that meaningfully speaks to this issue. And, second, the government likewise offers no legal authority to support its underlying premise—*viz.*, that a *Brady* claim cannot be based on a piece of evidence that could only affect a question to be decided by the court rather than the jury—and we have not unearthed any. For example, can it truly be said that such evidence can never, as a categorical matter, engender "a reasonable probability that the result of the proceeding would have been different"? *Reese*, 745 F.3d at 1083. It is enough for us to note that, in light of the government's scant presentation here, we may assume that Defendants-Appellants could make a *Brady* argument based on the suppression of evidence pertinent to an R.S. 2477 defense in a criminal prosecution.

planning, grazing and maintenance records" as well as "field investigations of each disputed route").

Given the evidence-intensive nature of such inquiries, one could reasonably question how far a single map could ever advance the enterprise of establishing an R.S. 2477 right-a-way. In any event, we have little difficulty here concluding that the 1979 map not only falls far short of the task, but also cannot be deemed material under *Brady*.[11] Specifically, the map simply shows a single red, dashed line running alongside Recapture Creek. The map's legend does not indicate the significance of such a dashed line. Moreover, no other evidence was presented during the trial concerning the scope or extent of use along the purported route prior to repeal of R.S. 2477.

Thus, we would be hard-pressed to conclude that the map is sufficient to establish the existence of an R.S. 2477 right-of-way, much less its scope. Nor, more to the point, is the map material to such purposes. At most, one could infer from the map's dashed, single red line some public use as a thoroughfare before 1979. Even assuming in that regard that the line does indicate some form of public use, the quantity of such use is not apparent from the face of the map. Neither does the map speak in any apparent way to the scope of the use of the route, such as whether ATVs were used on the route prior to the repeal of R.S.

_____

[11]    A copy of the map and an enlarged image of the relevant area can be found in a supplement *infra*.

2477 or whether it was instead a mere foot or horse trail. The map's legend sheds no light on these issues, nor does any other evidence in the record.

The Defendants-Appellants' motion for a new trial before the district court failed to otherwise shed light on why the map should be deemed material for establishing an R.S. 2477 right-a-way. Instead, it simply assumes that the map demonstrates the existence of such a right-of-way. *See, e.g.*, Aplt. Wells's App., Vol. VI, at 1178 ("[T]here was no disclosure that the BLM Map in the BLM's files indicated the existence of an R.S. 2477 right-of-way on Recapture Canyon Road."). An affidavit filed with the motion for a new trial averred conclusorily that the dashed, red line denotes a public highway that is an unadjudicated R.S. 2477 right-a-way, and that it is the same route on which the Defendants-Appellants rode. However, it is silent as to the scope of the alleged R.S. 2477 route, and the affidavit contains no assertion regarding the extent, nature, or duration of public use of the route.

Defendants-Appellants' appellate briefing similarly assumes that the map in question establishes the existence of such a right-of-way. At best, their briefing argues that the map could have "augmented" unspecified evidence "of a legitimate right-of-way on a county road that nearby residents had been using for decades." Aplt. Wells's Reply Br. at 22. But such speculation is insufficient to establish materiality for *Brady* purposes. *See United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012) ("In [determining whether evidence is material],

we evaluate the withheld evidence 'in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist.' We do not, however, resort to speculation. 'The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard.'" (citations omitted) (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1518–19 (10th Cir. 1995))); *cf. United States v. Rogers*, 960 F.2d 1501, 1511 (10th Cir. 1992) ("Rogers further argues that had he been given the documents in a timely manner, he could have reviewed, investigated, and properly developed his defense, and that it is probable that the jury would have reached a different result. We have held that, 'the relevant standard of materiality does not focus on trial preparation, but instead on whether earlier disclosure would have created a reasonable doubt of guilt that did not otherwise exist.'" (quoting *United States v. George*, 778 F.2d 556, 561–62 (10th Cir. 1985))). The mere possibility that, in light of the map, the Defendants-Appellants might have been able to craft a successful R.S. 2477 defense is not enough to make out a *Brady* claim.

In short, the evidence in the form of the 1979 map "is too little, too weak, [and] too distant . . . to meet *Brady*'s standards." *Turner v. United States*, --- U.S. ----, 137 S. Ct. 1885, 1894 (2017). Even if we make ambitious inferences from the map and the accompanying affidavit, in our view, Defendants-Appellants have not demonstrated the element of materiality. *See, e.g.*, *Geames*, 427 F.3d at 1337 ("[T]he defendant has the burden of demonstrating [the three elements of a *Brady*

claim].").  The extent, scope, and duration of public use of the trail prior to 1976 is not established by the map, and because we are left with at best speculation as to those decisive questions, Defendants-Appellants have failed to carry their burden.  Put another way, the map fails to create a reasonable probability of a different outcome so as to cast doubt on Defendants-Appellants' convictions—that is, it is not material under *Brady*.  Accordingly, the district court properly denied Defendants-Appellants' motion for a new trial based on this purported *Brady* violation.

**E.     Restitution**

The district court ordered Mr. Lyman to pay approximately $96,000 in restitution, of which the court ruled Mr. Wells was jointly and severally responsible for $48,000.  Mr. Wells principally challenges the restitution order on two grounds: (1) it includes harms that are not recoverable as restitution because they were not caused by the conspiracy and its underlying conduct, and (2) it includes amounts that are not legally cognizable as actual loss or supported by the evidence.  Mr. Lyman appears to make a similar argument regarding causation and also attacks the court's fact finding.

"We review the legality of a restitution order de novo."  *United States v. Shengyang Zhou*, 717 F.3d 1139, 1152 (10th Cir. 2013).  We assess "the factual findings underlying a restitution order for clear error and the amount of restitution imposed for abuse of discretion."  *Id.* (quoting *United States v. Bowling*, 619 F.3d

1175, 1187 (10th Cir. 2010)).  "The government bears the burden of proving the amount of loss by a preponderance of the evidence."  *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008); *see also United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007) ("The government bears the burden of proving the amount of loss, and the district court resolves disputes over the proper amount of restitution by the preponderance of the evidence.").  It necessarily follows that the government also bears the same burden regarding the subordinate question of what harms are properly included in the loss calculation because they are "a result of the offense."  18 U.S.C. § 3664(e); *see United States v. Ritchie*, 858 F.3d 201, 211 (4th Cir. 2017); *United States v. Patty*, 992 F.2d 1045, 1051 (10th Cir. 1993) ("[A]lthough Defendant could be ordered to pay restitution in an amount up to $25,000,000, she could not be ordered to pay restitution in excess of those losses which the government proved were the result of her fraudulent acts.").

### 1.    *Causation*

Under the Mandatory Victims Restitution Act ("MVRA"), which undisputedly governs the restitution analysis here, restitution shall be ordered for an offense causing damage to property by either returning property, or if

> impossible, impracticable, or inadequate, pay[ing] an amount equal to . . . the greater of . . . the value of the property on the date of the damage . . . or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1).  The MVRA requires courts to order a defendant to pay

restitution to a "victim" of the offense. *See* 18 U.S.C. § 3663A(a)–(c). No party disputes that the United States can constitute a "victim" under the MVRA. *See United States v. Quarrell*, 310 F.3d 664, 677 (10th Cir. 2002) ("[T]he government can be a 'victim' under the MVRA."). However, the question here is for what alleged harms can the United States properly recover restitution, and the answer to that question requires an inquiry into causation.

The MVRA's definition of "victim" provides:

> [T]he term 'victim' means a person *directly and proximately harmed* as a result of the commission of an offense for which restitution may be ordered *including*, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct *in the course* of the scheme, conspiracy, or pattern . . . .

18 U.S.C. § 3663A(a)(2) (emphases added).

In *United States v. Speakman*, we held that this language actually "sets forth two separate ways an individual [or entity, like the United States] can be a victim under the MVRA": first, the government may show that the victim was "directly and proximately harmed as a result of" the offense; and second, if a scheme, conspiracy, or pattern of criminal activity is "an element" of the crime at issue, the government may instead demonstrate that the victim was "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern of criminal activity." 594 F.3d 1165, 1169 (10th Cir. 2010) (quoting § 3663A(a)(2)).

Notably, "[t]he first clause [of the statute] also 'includ[es]' the second," *id.* at 1170 (third alteration in original), and thus all harms contemplated by the statute must be "directly and proximately" caused and also must be "the result of the commission of the offense." § 3663A(a)(2). However, the way a person can be shown to be a "victim" under the first clause is "in some ways broader [than the second clause] because it requires only that the individual be harmed 'as a result of' the defendant's offense, and not 'in the course of' the offense." *Speakman*, 594 F.3d at 1169–70. "It thus follows that an individual could be deemed a victim by meeting the first criteria only, and not the second." *Id.* at 1170. Consequently, even if a defendant was convicted of an offense involving a scheme, conspiracy, or pattern element—quite apart from the "in the course of" criterion—the government's evidence could still establish that a person suffered injuries making them a "victim" by proving under the first clause that the harms at issue were "as a result of" the offense. *See id.* ("Merrill Lynch's harm cannot be said to have arisen 'in the course of the scheme.' . . . Merril Lynch may still be a victim of Mr. Speakman's fraud if it meets the first criterion of § 3663A(a)(2): that is, Merrill Lynch may be a victim under the MVRA if it was 'directly and proximately harmed *as a result of*' Mr. Speakman's fraud.").

In addressing Defendants-Appellants' causation challenge, we elect to focus on whether the government has carried its burden under the first method. Like the second, this method is governed by the overarching direct-and-proximate

-45-

standard. *See Speakman*, 594 F.3d at 1170 (noting that "[t]he first clause [of the statute] also 'includ[es] the second" (third alteration in original)). In *Speakman*, we observed "that phrase 'directly and proximately' uses the conjunctive 'and,' which indicates that direct harm and proximate harm have separate meanings." *Id.* at 1171. And discerning these separate meanings to relate to, respectively, "but-for" and "proximate" causation, the *Speakman* court held that "the government must show both that the defendant's conduct is the 'but-for' cause of the individual's [or entity's] harm and that the defendant 'proximately' caused the harm." *Id.*; *see* 3 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE, CRIMINAL 4D § 546, Westlaw (database updated Apr. 2017) ( "Generally, the government must show [under the federal restitution statute] both that the defendant is the but-for cause of the person's harm and that the defendant was the proximate cause of the person's harm."). The general meanings of but-for and proximate causation are well-known in the law. *See, e.g.*, *United States v. Burkholder*, 816 F.3d 607, 612–14 (10th Cir. 2016) (defining and analyzing the concepts of but-for and proximate causation in the context of a criminal prosecution).

But, more specifically, in the restitution context, the Supreme Court has opined that "[t]he basic question that a proximate cause requirement presents is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Robers v. United States*, --- U.S. ----, 134 S. Ct. 1854, 1859 (2014)

-46-

(quoting *Lexmark*, 134 S. Ct. at 1390)). And answering this question generally entails an inquiry into the foreseeability of the harm. *See id.* ("Robers argues that where, as here, a victim receives less money from a later sale than the collateral was worth when received, the market and not the offender is the proximate cause of the deficiency. We are not convinced . . . . Fluctuations in property values are common. Their existence . . . is foreseeable." (citation omitted)); Catharine M. Goodwin, FEDERAL CRIMINAL RESTITUTION § 6:10, Westlaw (database updated Aug. 2017) ("Post-MVRA case law on the causation of restitution harms has demonstrated that the emerging criteria for whether an offense was the proximate cause of a particular harm to a victim focus primarily on whether that harm was reasonably foreseeable to the defendant in committing the offense of conviction . . . ." (footnote omitted)); *cf. Paroline v. United States*, --- U.S. ----, 134 S. Ct. 1710, 1718, 1721, 1731 (2014) (rejecting restitution objection under statute that has a "proximate-cause requirement" that is specifically focused on restitution for crimes involving the sexual exploitation of children and child pornography in particular by noting that "[i]t was readily foreseeable that Paroline's crime could cause Amy to suffer precisely the types of losses that she claims . . . ."). "As Justice O'Connor has noted 'proximate cause principles inject a foreseeability element into [a] statute.'" *Burkholder*, 816 F.3d at 613 (alteration in original) (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Oregon*, 515 U.S. 687, 713 (1995) (O'Connor, J., concurring)).

Turning to the parties' arguments, with respect to but-for causation, the government's principal contention was that the conspiracy and its underlying conduct was the but-for cause of "motorized damage to archeological, riparian, and upland soil resources in the closed area." Aplee.'s Br. at 43. We conclude that the government presented ample evidence from which the district court could find by a preponderance of the evidence that this was so. The court did not clearly err in this regard.

Notably, the government introduced photos of the area taken before the ride and photos taken two days after it; the latter supported its contentions of motorized damage. Furthermore, prior to the restitution hearing, Chief Ranger Moore offered an affidavit that the trail camera had taken photos of about thirty-two "motorized vehicles"; though overexposed, the court could readily infer from these photos that multiple riders traveled through the area in Recapture Canyon that the BLM had closed to ATV users at the time of the protest ride and caused significant motorized damage. *See* Aplee.'s Supp. App., Vol. III, at 323 (Aff. of Chief Ranger Jason Moore) (noting that the thirty-two riders "would have had to travel over seven archeological sites, through nine riparian crossings, and up some steep hills"). Thus, we conclude that the government's proof satisfied but-for causation.

As for proximate causation, "[w]here there are causes in addition to the offense conduct that appear to have contributed to the harm suffered by the

victims of the offense, the issue is raised as to whether the defendant bears the risk of all the harm or whether the chain of causation was in effect broken by the intervening cause, resulting in less harm for which the defendant would be held liable in restitution." Goodwin, *supra*, § 6:13. Thus, we reasoned in *Speakman* that the proximate-cause requirement is satisfied "if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense." 594 F.3d at 1172; *accord United States v. Carmick*, 796 F.3d 1206, 1223 (10th Cir. 2015); *see also United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999) ("[T]he main inquiry for causation in restitution cases becomes whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct."); Goodwin, *supra*, § 6:13 ("In many cases the issue of intervening causation is a key part of the restitution causation analysis."). The direct-relation requirement means that the intervening cause must not be "too attenuated . . . so that it would be unjust to hold . . . responsible" the defendants. *Speakman*, 594 F.3d at 1172.

Mr. Wells and Mr. Lyman argue that the government did not establish proximate causation because "the scope of the alleged conspiracy ended at the turnaround on the Pipeline Road," Aplt. Wells's Opening Br. at 63; they personally never traveled beyond that turnaround; and most of the damage occurred beyond it. *See* Aplt. Lyman's Opening Br. at 33 (arguing that the government has "not produced convincing evidence that even one ATV traveled

-49-

past that point [i.e., the turnaround], and certainly cannot legitimately claim that *it was part of my plan* to do so" (emphasis added)); Aplt. Wells's Reply Br. at 28 ("Damage caused by riders off the Pipeline trail was not directly related to Mr. Wells' ride because (1) the conspiracy had terminated, and (2) Mr. Wells did not cause the damage."). In effect, Defendants-Appellants argue that if any damage occurred at all, it was due to riders other than them who were not coconspirators and whose conduct should not otherwise be attributed to them. In effect, they reason that those other riders who continued riding south of the Pipeline Road should be viewed as an intervening cause, breaking the chain of proximate causation.

However, even if we assume *arguendo*, following the logic of Defendants-Appellants' argument, that the southbound riders were an intervening cause, we still reject their ultimate conclusion. We determine that the government has established proximate causation. Specifically, we conclude that this purported intervening cause was directly related to the offense conduct—that is, the conspiracy—and thus a proper predicate for the establishment of proximate causation. In this regard, Defendants-Appellants' focus on the ostensible termination of the conspiracy is misguided. As we made clear in *Speakman*, in the analogous context of a fraudulent scheme, intervening causes may still be directly related to the offense conduct for purposes of proximate causation "well after the conclusion" of that offense conduct. 594 F.3d at 1170; *id.* at 1172 ("We

-50-

have little difficulty in concluding that the arbitration was 'directly related to the offense conduct,' because Mrs. Speakman initiated the arbitration directly in response to Mr. Speakman's fraud in an attempt to recover the money he stole from her. This is a direct relationship that is not too attenuated from Mr. Speakman's fraud so that it would be unjust to hold him responsible.").

In other words, even if we assume *arguendo* that those who rode south beyond the Pipeline Road turnaround exceeded the conspiracy's scope and were not coconspirators, their conduct could still be deemed directly related to that conspiracy. These riders initiated their ride in closed portions of Recapture Canyon "directly in response to," *id.* at 1172, Defendants-Appellants' conspiratorial efforts, as the district court put it, to "organize a protest ride in closed areas in Recapture Canyon." Aplt.'s App., Vol. VII, at 1421 (Tr. Restitution Hr'g., dated Oct. 28, 2015). And, as the court further observed, the geography of the area made it entirely foreseeable that the riders would continue south beyond the turnaround, even if the object of the conspiracy had been attained. Specifically, the court noted:

> The map presented by defendant Wells showing the proximity at the end of the canyon, the Brown's Canyon end, to the city of Blanding further demonstrates the inevitability that riders would not choose to follow the longer northern route to return back the way they came but would loop back through the southern route of Brown's Canyon through the closed area.

*Id.* at 1421–22. In other words, that riders who had come to ride on closed trails

within Recapture Canyon as part of an unlawful conspiracy that Defendants-Appellants promoted might ride on trails beyond those on which the Defendants-Appellants themselves chose to ride and beyond those within the ostensible scope of the conspiracy is the kind of intervening cause that has "a direct relationship that is not too attenuated from" the conspiracy, *Speakman*, 594 F.3d at 1172—especially when one of these trails provided the most convenient route back to a residential city. *Cf. United States v. Spinney*, 795 F.2d 1410, 1417 (9th Cir. 1986) (awarding restitution under a pre-MVRA statute, in a conspiracy-to-assault case that resulted in the deaths of the targeted parties, and noting that "[a] restitution order is authorized if the defendant created the circumstances under which the harm or loss occurred"). Accordingly, we conclude that the government's evidence established proximate causation.

\*\*\*

In sum, the district court did not err in ruling that Defendants-Appellants were responsible for paying restitution to the United States for damages stemming directly and proximately from Defendants-Appellants' unlawful conspiracy to conduct a protest ride in closed portions of Recapture Canyon.

### 2. *Amount of Actual Loss*

Defendants-Appellants challenge three aspects of the total amount of restitution ordered: (1) that the approximately $65,000 spent assessing the damage caused by the ATV ride was "speculative archeological expenses disallowed in

*Quarrel*," Aplt. Wells's Opening Br. at 59; *cf.* Aplt. Lyman's Opening Br. at 32;

(2) that the assessment costs were not "incurred during participation in the

investigation or prosecution of the offense," Aplt. Wells's Opening Br. at 60; and

(3) that at least some of the claimed amount was supported by estimates, not

concrete figures.

First, it is beyond dispute that restitution "must be based on *actual* loss."

*Quarrell*, 310 F.3d at 680. However, contrary to Mr. Wells's argument, the

damages assessment that the government requested—the cost of which was

included in the restitution order—does not constitute speculative, archaeological

damages of the kind that we barred in *Quarrell*. "Archaeological value" is a term

of art under the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C.

§ 470ff(a)(2)(A), and is defined in its implementing regulations as "the value of

the information associated with the archaeological resource. This value shall be

appraised in terms of the costs of the retrieval of the scientific information which

*would have been* obtainable prior to the violation." *Quarrell*, 310 F.3d at 679

(emphasis added) (quoting 43 C.F.R. § 7.14(a)). Thus, "archaeological value,"

rather than constituting a measure of actual loss, "is an effort to go back in time

before the violation occurred and estimate what it *would have cost* the United

States to engage in a full-blown archaeological dig at the site, notwithstanding the

fact that the United States had no plans to engage in any such effort." *Id.*

(emphasis added) (quoting *United States v. Hunter*, 48 F. Supp. 2d 1283, 1288 (D.

Utah 1998)).

Thus, in *Quarrell*, we held that "includ[ing] archaeological value in determining the *amount* of restitution" was error. *Id.* at 679–80. But here, the parties disclaimed any applicability of the ARPA, Aplt. Wells's App., Vol. VII, at 1336 (Mr. Lyman's counsel stating that the ARPA is "sort of irrelevant to the analysis" after the Assistant United States Attorney stated "This isn't an ARPA case"), and the assessment that took place was detailed and anything but hypothetical, *see* Aplee.'s Supp. App., Vol. II, *passim* (detailed assessment of damages). Although the damages assessment included ARPA estimates, *id.* at 294–301, those estimates were not the basis for the restitution order. Thus, *Quarrell* is inapposite.

Second, the MVRA provides that, in all cases, a victim must be reimbursed "for . . . expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(1). And we have specifically recognized that the government's investigatory costs can constitute actual losses subject to restitution. *See Quarrell*, 310 F.3d at 681 (holding there was no abuse of discretion in including in a restitution order $300 for the services of a law enforcement officer in investigating damage to archaeological sites). We thus reject Mr. Wells's assertion that the expenses the government incurred to assess the motorized damage in Recapture Canyon were not incurred during its participation in the investigation or prosecution of the offense.

-54-

In particular, we conclude that the D.C. Circuit decision that Mr. Wells cites is inapposite because that case establishes only that an *internal* investigation "cannot be said to be necessary if the investigation was neither required nor requested by criminal investigators or prosecutors." *United States v. Papagno*, 639 F.3d 1093, 1095 (D.C. Cir. 2011). But here, the BLM requested the assessment of damages for its criminal investigation of Defendants-Appellants—indeed, besides having been undisputedly requested by the BLM, every page of the assessment report is marked "PREPARED FOR LAW ENFORCEMENT PURPOSES." *See* Aplee.'s Supp. App., Vol. II, at 195. The Defendants-Appellants do not otherwise argue that the assessment was unnecessary. Accordingly, we can find no abuse of discretion in the court's inclusion as restitution of costs related to this assessment report.

Third, as to Mr. Wells's final argument, we conclude that it is based on a mistaken view of the record. Contrary to his position, the government did not "admit[] that its damages 'are not hard numbers'—'there can be some wiggle room in there.'" Aplt. Wells's Opening Br. at 59–60. Read in context, the prosecutor was simply attempting to explain why restitution figures from an earlier case involving illegal trail construction in Recapture Canyon could not be considered as a basis for comparison with the present case.[12] The restitution

---

[12]    Mr. Wells seeks to invoke such comparisons here in arguing that the
(continued...)

figure in that case could not provide a baseline for the present case, the

government reasoned, because there the defendants did not contest restitution,

entered a plea deal with the government, and the restitution amount was

negotiated.  Thus, the $30,000 damages figure in the earlier case was not based on

"hard numbers" and so had "some wiggle room."  Defendants-Appellants' final

argument is thus misguided and spurious.

* * *

Based on the foregoing, we uphold in full the district court's award of

restitution.

## F.      Mr. Lyman's Ineffective Assistance of Counsel Claim

Mr. Lyman attempts to raise here, on direct appeal, an ineffective

assistance of counsel claim.  Because of the typical necessity of developing a

separate factual record pertinent to an ineffective-assistance claim, we have held

---

[12](...continued)
district court's restitution order effected a disparate result when compared to the restitution ordered in other criminal proceedings for similarly situated defendants. Aplt. Wells's Opening Br. at 64.  However, this sort of argument is inapposite in the MVRA context, where restitution is mandatory.  *Compare* 18 U.S.C. § 3663A(a)(1) ("[W]hen sentencing a defendant convicted of an offense described in subsection (c), the court *shall* order . . . ." (emphasis added)), *with* 18 U.S.C. § 3553(a)(6) (stating, as to elements of the discretionary criminal sentence, that the court "shall consider . . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"), *and United States v. Smart*, 518 F.3d 800, 805 (10th Cir. 2008) ("[I]t has been well settled that we review a district court's sentencing decisions solely for abuse of discretion.").

that "[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.  Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed."  *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc); *accord United States v. Holloway*, 826 F.3d 1237, 1243 (10th Cir. 2016).  Mr. Lyman makes no attempt to argue that his claim is one of the rare ineffective-assistance claims that may and should be addressed on direct appeal, and we see no reason to reach its merits.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment and restitution order.

# SUPPLEMENT

**A. 1979 BLM Map** (Aplt. Wells's App., Vol. VI, at 1189)



**B. 1979 BLM Map Detail** (Aplt. Wells's App., Vol. VI, at 1191)



16-4006, 16-4007 – *United States v. Wells*

**HARTZ,** Circuit Judge, concurring:

I join the opinion except for the discussion in § II(D)(2) suggesting the possibility that a defendant charged with what amounts to criminal trespass cannot challenge the legality of a BLM closure order. *Cf. United States v. Gemmill*, 535 F.2d 1145, 1150–52 (9th Cir. 1976) (reversing trespass conviction on ground that forest supervisor lacked authority to issue closure order).